**HILL WALLACK**
BY:   **JOANNE RATHGEBER, ESQUIRE**
Attorney I.D. No. 30391
111 East Court Street
Doylestown, PA 18901
215-340-0400                                            Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et. al. | : | CIVIL ACTION |
|     Plaintiffs, | : | No. 05-03389 |
| | : | (CONSOLIDATED) |
|     v. | : | |
| | : | |
| CONECTIV; A.C. DELLOVADE, INC.; STEEL | : | |
| SUPPLIERS ERECTORS, INC.; MATRIX | : | |
| SERVICES INDUSTRIAL CONTRACTORS | : | |
| (d/b/a BOGAN, INC./HAKE GROUP); IBEW | : | |
| LOCAL 375; IRONWORKERS LOCAL 36 | : | |
|     Defendants. | : | |

## O R D E R

AND NOW, this _____ day of _____, 2006, it is

hereby ORDERED and DECREED that upon consideration of Plaintitffs/Intervenors

Motion for Summary Judgment and responses thereto, said Motion is GRANTED.

**BY THE COURT:**

_____
                                                                    J.

1

**HILL WALLACK**
BY:   **JOANNE RATHGEBER, ESQUIRE**
Attorney I.D. No. 30391
111 East Court Street
Doylestown, PA 18901
215-340-0400                                    Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et. al.     Plaintiffs, <br><br> v. <br><br> CONECTIV; A.C. DELLOVADE, INC.; STEEL SUPPLIERS ERECTORS, INC.; MATRIX SERVICES INDUSTRIAL CONTRACTORS (d/b/a BOGAN, INC./HAKE GROUP); IBEW LOCAL 375; IRONWORKERS LOCAL 36     Defendants. | CIVIL ACTION <br> No.  05-03389 <br> (CONSOLIDATED) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiffs in this matter are tradesmen.  Keith Riddick and Jeff Campbell are electricians and members of The International Brotherhood of Electrical Workers Local Union No 375.  Roy Grimes is a heavy equipment operator. James T. Slater is an ironworker and a member of the International Union of Ironworkers Local No. 36.  They are hard working African Americans who were trying to earn a living to support their families.  They were subjected to atrocious ridicule, harassment and discrimination.  These Plaintiffs are members of a class

2

of African American men who suffered racial harassment and discrimination at a power plant construction site owned by Defendant Conectiv in Bethlehem, Pennsylvania.

At various times during 2002 and 2003 these men were assigned by their respective unions to Conectiv's Bethlehem facility.  There were close to 1000 men of various trades working on that site.  Approximately 20 were African American.

Plaintiffs Keith Riddick and Jeffrey Campbell were employed by Defendant Matrix Services Industrial Contractors (d/b/a Bogan, Inc./Hake Group) (hereinafter referred to as Bogan).   Other than the short period of time their period of employment overlapped, they were the only black men assigned to the site by Defendant IBEW Local 375 (hereinafter referred to as Local 375).  Plaintiff James T. Slater was the only black ironworker out of Defendant Ironworkers Local 36 (hereinafter referred to as Local 36), and the only black employee of Defendant Steel Suppliers Erectors, Inc. (hereinafter referred to as Steel Suppliers).  Plaintiff Roy Grimes was the only black operator employed by Defendant A.C. Dellovade, Inc. (hereinafter referred to as Dellovade).  There were no African American foremen on the Conectiv site (Rompilla N/T 39, Ex. "N")

On Conectiv's Bethlehem site there were approximately 50 portable toilets which were covered with disgusting racial graffiti.  Workers walked around the

3

site with hard hats displaying insignias of the Ku Klux Klan.   Racial jokes were told openly.  Hate Groups solicited members in the lunch room.  This racially hostile environment was intolerable, yet these Defendant employers and unions did nothing to rectify the situation.

Although this matter involves multiple Plaintiffs, multiple Defendants, and multiple issues, it is clear that all Defendants are all liable for the hostile environment in which these Plaintiffs were forced to work.

## II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P 56(c).  The Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

An issue of material fact is "genuine" for purposes of summary judgment, if evidence is such that a reasonable jury could return a verdict for the non-moving party.  Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d 123 (3d. Cir. 1994).   In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable

inferences must be drawn in favor of the non-moving party.  Anderson, at 256. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case.  J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d. Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).

In ruling on a motion for summary judgment, the court's role under Rule 56 is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. Anderson at p. 249.

In the instant case, even though there are some discrepancies in the testimony, those discrepancies pale in the face of the admitted facts in this case. The testimony by Defendants alone is sufficient to establish liability on the part of all Defendants.  The following is testimony from supervisory personnel from all Defendants who admit to seeing graffiti, receiving complaints and failing to take appropriate action to remedy the situation.  Not one supervisor was trained to identify, report or respond to complaints of racial hostility and harassment.  Every one of these supervisors knew it existed, but not one took action to stop it

There are no material issues of fact.  The facts presented are those of the defense only.  Evidence presented by the Plaintiffs is demonstrative alone.

III.   **EVIDENCE OF HOSTILITY**

A.  **Portable Toilets Covered With Racial Graffiti**

Using a bathroom is a basic necessity of life.  Plaintiffs had no choice but to go into these portable bathrooms.  When they did so they were faced with the following messages scribbled on the walls:

- White Power
- KKK
- Who Let that Dirty Nigger J.T. into Local 36
- Yea who do dat
- Aryan Nation
- White man rules
- Pictures of hooded clansman
- If u not white u not right
- Coon
- Burr head parasite
- Nigger pussy trash mother fucker
- MLK day is only celebrated by his brothers
- Rat coons
- MLK day black holiday – kill 4 more so we can have the week off
- J.T. = dirty nigger
- 666 home
- J.T. ballbasher
- Ku Klux Klan
- Seig Heil
- Swastika
- If black is beautiful I just shit a masterpiece

6

- The nigger is the one who ass fucked the whore who shit out the pale face
- Jack Flemish sucks nigger cock
- He loved big dirty nigger cock
- Love the KKK
- Go back to where we brought you from
- Kill niggers

Because of his frustration caused by the lack of action by management, Keith Riddick took pictures of some of the portable bathrooms. Pictures of the above horrendous racial slurs were marked as EEOC Exhibits 1066 through 1100 and are attached and marked as Exhibit "A".

Most deponents testified that racial graffiti is rampant at every construction site. It has become such a common sight that although management sees it, they do not read it. (Woods N/T 49-51, 63 attached and marked Exhibit "B"; Kane N/T 21, 25 attached and marked Exhibit "C"; David N/T 27, 40 attached and marked Exhibit "D"; Mann N/T 39 attached and marked Exhibit "E"; Kennedy N/T 68, 69, attached and marked Exhibit "F"; Newhard N/T 59 attached and marked Exhibit "G"; Thomas N/T 24, 25 attached and marked Exhibit "H"; Kilpatrick N/T 30 attached and marked Exhibit "I")

Almost every supervisor has been proven to use these portable toilets. As evidenced by the attached pictures, they would have to be blind not to be aware of the racial slurs and obvious hatred of the black man. The law uses the words "knew or should have known". These supervisors testified that they have

become so accustomed to this racial graffiti that they are immune to it.  That is no excuse.  Each of them used those toilets.  Michael DelCasale (Soto N/T 24, attached and marked Exhibit "J"), Conectiv employees (Mann N/T 121, Ex "E"), Herman Beaulieu (Mann N/T 69, Ex. "E"), Charles Wood  (Wood N/T 46, Ex. "B"), (Soto N/T 24, Ex. "J"); Joseph Kennedy (Kennedy N/T 68, 69, Ex. "F") (Keyser N/T 99, attached and marked Exhibit "K").  Each one of these management level employees saw, or purposely refused to see, racial graffiti of the worst kind.

### B.  <u>Open Displays of Racial Hostility</u>

Racial hatred was openly displayed on the worksite in open view of management of every company involved in the project.  The following are some examples:

- Hard hats displaying KKK symbols
- Hard hats displaying confederate flags
- Shirts bearing "White Power"
- Workers with tattoos of KKK and other hate group insignia
- Trucks displaying confederate flags
- Hangman's noose hanging in worksite

There were symbols of white Aryan resistance, white power and confederate flags on lunch boxes, scarves, cars, helmets and tattoos.  (Soto N/T 58, 62, Ex. "J")

Charles Wood (Woody) was Steel Suppliers' General Foreman.  His known dislike for African Americans was reported to Charles Mann, who was a

Steel Supplier Foreman and Local 36 Steward. A steel connector said to Mann "Do you have many niggers in your local? Because Woody don't like niggers". (Mann N/T 35, Ex. "E") Mann took it from that comment that Woody would make it difficult on black workers in an effort to try to get them to quit or get them fired from the worksite. (Mann N/T 103, Ex. "E") Mann never reported that statement to anyone. (Mann N/T 127, Ex. "E")

The racial hatred on this work site caused these Plaintiffs to fear for their lives and the welfare of their families.

## IV.   **ALL DEFENDANTS HAD NOTICE OF RACIAL HOSTILITY**

The following is a list of management level employees of the Defendants, employees and union members.   Set forth below are excerpts of their testimony.

Conectiv:          Michael (Redbeard) DelCasale, Project Manager
                   Robert Keyser, Construction Manager
                   Neil Gerwig, Construction Representative to Steel Suppliers
                        and Bogan

Bogan/Hake:        Joseph Kennedy, Project Manager
                   Joseph Kane, General Foreman
                   Terry Hartman, General Foreman
                   Richard (Butch) Anewalt, Assistant General Foreman
                   David Rompilla, Foreman

Steel Suppliers:   Charles Wood,  General Foreman
                   Richard Frankenfield, Foreman
                   Charles Mann, Foreman and Union Steward
                   William Thomas, Foreman

                   Ruben Soto, Ironworker
                   Anthony David, Foreman and Union Steward

Dellovade:          Charles Mann, Foreman  (He worked at the site for both
                                           Steel Suppliers and Dellovade
                                           at different times.)

IBEW Local Union 375:  William Newhard, Business Manager

Ironworkers Local Union 36:    Robert Kilpatrick, Business Manager
                               Richard Frankenfield, President

### A. Defendant Bogan/Hake:

#### 1. Joseph Kennedy, Project Manager

a. Racial Graffiti

Kennedy was the highest ranking Bogan employee on the site.

Kennedy was seen frequenting the portable bathrooms.  He testified that

all the bathrooms he used on the Conectiv site had graffiti in them.

(Kennedy N/T 111, Ex. "F")

He had been in the bathrooms regularly and was aware of it some

nine months prior to Riddick's complaint.  Although he tried not to read the

writing, he saw his own name written on the walls on several bathrooms.

What was said about him was derogatory and offensive.  There were

discussions with other people about the writing in the bathrooms.  The

graffiti was discussed at several meetings.  (Kennedy N/T 67-78, Ex. "F")


b. Noose

10

Kennedy also observed a hangman's noose on the site.  He was making his rounds and walked into the electrical equipment room and it was right there.  He did not investigate the noose.  He simply told an electrician to cut it down and get rid of it.  He discussed it with Hartman and other project managers.  He knew that nooses were used to lynch African Americans and believed they might be offensive to African American workers.  He never asked Riddick if he saw the noose.  Kennedy asked no questions about it.  (Kennedy N/T 118, 119, 121-123, 126, 129, 169, Ex. "F")

### 2. **Terry Hartman, General Foreman**

a. <u>Racial Graffiti</u>

Terry Hartman was General Foreman for Bogan.   Mr. Hartman admits seeing writing on the portable toilets and that the walls and the roof were completely covered with writing.  He did not dwell on the writing.   He did not remember specific things because he did not go in there "looking to read the crap that was on those walls."  He saw things that he would say were racial slurs.  He was exposed to it every time he went in the bathroom.  It was all around him.  It made him sick.  It was like that on every job site that he has ever been on since the 70's.  He did not condone that at all.  He thinks it is 100% wrong to put racial slurs on the walls. (Hartman N/T 26, 32, 33, 35, attached and market Exhibit "L")

Hartman admits that it was Defendant Bogan's job to keep the bathrooms clean.  He would arrange to move the bathrooms around the site as need.  He would keep track of them so that he could inform the person who came to clean them where they were presently located.  He knew the cleaner was not able to get the writing off the walls.  (Hartman N/T 29, 30, Ex. "L")

b. <u>Noose</u>

Terry Hartman had knowledge of a noose on the worksite.  It had something to do with a rat in it.  There was a lot of buzz about it on the worksite.  He believed that Joe Kennedy investigated the issue.  (Hartman N/T 77, Ex. "L")

### 3. **Richard Anawalt, Assistant General Foreman**

a. <u>Racial Graffiti</u>

Richard Anewalt, Assistant General Foreman, testified that there were portapotties on the job site that anybody could use.  He saw writing on the walls.  The writing got worse as the project went on.  He read one in particular about Joe Kennedy.  He didn't read the rest of the stuff on the walls.  (Anewalt N/T 30, attached and marked Exhibit "M")

b. <u>Noose</u>

12

Richard Anewalt heard rumors that there was a noose on the site.  It was talked about because Keith Riddick mentioned to somebody that there was a noose on site. He never talked to Riddick about the noose. (Anewalt N/T 57, Ex. "M")

### 4. David Rompilla, Foreman

#### a. Racial Graffiti

He observed writing on the bathroom walls.  He doesn't know what it said.   He remembers seeing something anti-Semitic.  Portable toilets on construction sites have a lot of graffiti.  He has seen racial graffiti in toilets on construction sites.     (Rompilla N/T 44, 45, 52, 58-60, attached and marked Exhibit "N")

#### b. Noose

Rompilla observed a noose on the front of a dump truck.  He never thought about it being offensive to African American workers.  He told a Bogan employee of the noose.  He also told Matt Briggs, a Bogan employee, of the noose.  After reporting it, he again saw the truck with the noose.  There is no purpose for a noose on the job site.  He has never seen a noose used for a legitimate purpose. (Rompilla N/T 62-67, 98, 100, Ex. "N")

### 5. Joseph Kane, Foreman

a. <u>Racial Graffiti</u>

Kane testified that he saw writing on the walls of the portable bathrooms when he used them.  There is writing on every job johnnie on every job site.  However, he never reads the writing and does not know specifically what it was.  (Kane N/T 20, 21, 26, 35, Ex. "C")

## B. **IBEW Local Union 375**

### 1. **Rodney Haines, Steward**

a. <u>Racial Graffiti</u>

Rodney Haines was a Bogan employee and the job steward for Local 375.  It was his job to address and resolve complaints of the workers.  The steward's duty is to look out for the benefits of the men and pick up on violations of the Collective Bargaining Agreement.  He was appointed by Newhard, the Business Manager for IBEW.  Newhard appoints the steward and chooses someone compassionate and someone who understands the Collective Bargaining Agreement.  (Newhard N/T 29, 30, Ex. "G")

Rodney Haines was aware of the writing on the walls.  Anybody that worked on that job site knew there were things written on the toilet walls. (Hartman N/T 47, Ex. "L")

Haines was present in the trailer when Anewalt told Hartman that Riddick was complaining about graffiti in the bathroom.  Haines heard that

14

the complaint would be taken to the foremen meeting the next day.

(Anewalt N/T 65, Ex. "M")

### 2. **David Reichert,** Assistant General Forman/President of IBEW 375

Reichert was General Foreman and President of the Union.  He

received a direct complaint from Keith Riddick as to the graffiti in the

bathroom.  (Newhard N/T 26, Ex. "G")

## C. Conectiv

### 1. **Michael DelCasale, Project Manager**

#### a. Racial Graffiti

Terry Hartman saw DelCasale walk around the site.  He is sure that

DelCasale used the portapotties.  Hartman is sure that anybody that

worked on that job site knew there were things written on the toilet walls.

(Hartman N/T 47, 52, Ex. "L")

## D. Steel Suppliers and Dellovade

### 1. **Charles Wood, General Foreman**

#### a. Racial Graffiti

Writing on bathroom walls on construction sites is standard

procedure.  (Wood N/T 63, Ex. "B").   He has seen it for the last 35 years.

He does not pay any attention to it.  (Wood N/T 50, Ex. "B").  He

remembers seeing the writings that are depicted in the EEOC Exhibits.  He

remembers writings on the walls, but doesn't keep a picture in his mind of what it was.  (Wood N/T 47, 49, Ex. "B")

The amount of writing in EEOC Exhibit 1068 (Ex. "A") is about the amount of writings in those bathrooms.  Some have even more.  (Wood N/T 50, 51, Ex. "B")  Mr. Wood believes every bathroom he used had writing in it.  (Wood N/T 57, Ex. "B"). He saw racial graffiti but can't remember the words or the pictures.  (Wood N/T 96, Ex. "B")

### 2. **William Thomas, Foreman**

#### a. Racial Graffiti

Every portable bathroom he ever went into as long as he has been in the construction industry had writing on it.  There's stuff on the walls, but he doesn't pay any attention to it.  He never read any of it.  Even the ones that the supervisors use have writing in them.  He believes that racial graffiti is childish.  (Thomas N/T 24, 25, 29, 30, 63, Ex. "H")

### 3. **Charles Mann, Foreman**

#### a. Racial Graffiti

Mann, while foreman for Dellovade and Union Steward for Steel Suppliers, is sure there was racial graffiti, although he did not look for it.  (Mann N/T 39, 64, 85, 89, Ex. "E").  He distinctly remembered the Jack Flemish comment.  He remembers laughing about that one. He is sure that

he saw the swastika.  There was as much graffiti as is depicted in the

photographs.  (Mann N/T 90, 92, 95, 96, Ex. "E")

Mann recalls rumblings going through the other trades that blacks

were complaining about the graffiti.  The rumors were in all the other

trailers.  It involved the entire site.  (Mann N/T 67, 69, 71, Ex. "E")  Mann

saw confederate flags on hard hats.  He saw tattoos with swastikas.

(Mann N/T 42, 80, Ex. "E")        Mann heard men in the trailer say nigger,

but never reported it.  He heard comments such as "how come that fucking

nigger wasn't eating with us".  (Mann N/T 48-49, Ex. "E")

### 4. Ruben Soto, Member of Ironworkers 36

a. Racial Graffiti

Soto was a member of Local 36.  He testified that every bathroom he

used was full of racial graffiti.  He recognized and identified the slurs in

each of the photographs.  (Soto N/T 36-40, 49, Ex. "J").

On one occasion he saw Woody come out of a bathroom and

suggested to Redbeard that he go into the toilet and read one of the jokes.

Another Steel Supplier employee said "Woody is getting his kicks off the

nigger joke".  Redbeard came out of the bathroom shaking his head and

smiling.  (Soto N/T 24-26, Ex. "J")

Soto witnessed Woody listening to "nigger" jokes.  Woody never

disciplined anyone or asked them to stop making comments or to stop

telling such jokes.  Soto heard Tony David, the Union Steward, tell racist jokes.  He heard blacks called dumb.  (Soto N/T 51-55, 79, 81, Ex. "J")

Brian Yannick, an ironworker, tried to get Soto to attend a hate group pep rally.  Soto was handed literature with a neo Nazi sign and a hooded man on the front.  Yannick had a neo Nazi sign on his hard hat. (Soto N/T 53-59, Ex. "J")

Soto testified that he saw Bill Dender, an ironworker use a Marlboro pack of cigarettes to create a KKK symbol.  This took place in the break room.  (Soto N/T 76, 77, Ex. "J")  Soto complained to the steward who told him that he would take it up with Kilpatrick. (Soto N/T 123, Ex. "J")

b. Noose

Soto saw a noose hanging in a HRSG building, which was pointed out to him by Riddick.  He saw another noose that had a doll or a bear in it. He believes that Woody and Redbeard saw the noose.  (Soto N/T 68-71, 13, Ex. "J")

5. **Anthony David, Steward**

a. Racial Graffiti

Anthony David was the union steward.  He testified that he observed graffiti on the walls of the portable bathrooms.  He doesn't recall what they said.  (David N/T 26, Ex. "D")

18

Mr. David did see some racial graffiti.  He remembers seeing "Jack Flemish blowing or sucking nigger cocks".   (On that wall the word "nigger" was written three times)  He thought that was offensive to Jack who is white.  He believes the word "nigger" is offensive to African Americans.  He thought it was more a sexual thing against Jack, an ironworker.  He remembers seeing JT's initials, but doesn't recall what it said after.  He knew that JT was James Slater.  (David N/T 26, 38-39, Ex. "D")

Graffiti in the bathroom is pretty commonplace.  He has seen racial graffiti on other sites.  (David N/T 41, Ex. "D")

When David was shown EEOC Exhibit 1066 he testified that he does remember reading some things on that bathroom wall.  (EEOC Exhibit 1066 has MLK, rat, coon, nigger, go back to where we brought you from, burr head,  if you not white u not right, Aryan nation, white man rules, KKK, the picture of a Klansman,  nigger , and a swastika. See Ex., "A").  (David N/T 46, Ex "D")

David remembers an incident in the trailer in which James Slater ate lunch. There were 10-20 people in the trailer.  He remembers somebody having a Marlboro pack and turning it a certain way to make it look like a KKK symbol.  It was passed around to several people.  (David N/T 64, 82, Ex. "D")

David is sure there was a lot of racial and sexual comments in the trailer and that there were racial jokes. (David N/T 66, 67, Ex. "D") He saw the initials JT on the wall. He believes it was straight ahead when you walked in. He understood it to be derogatory to Slater. He never talked to Slater about it. (David N/T 80, Ex. "D") David testified that the Conectiv portable toilets were marked up more than normal. (David N/T 49, Ex. "D")

V. **ALL DEFENDANTS RECEIVED COMPLAINTS ABOUT THE RACIAL GRAFFITI**

Although each Plaintiff made complaints of their own, it was agreed by Plaintiffs that Keith Riddick would be their spokesperson. (Grimes N/T 291, 293 attached and marked Exhibit "O"; Slater N/T 130, attached and marked Exhibit "P"; Campbell N/T 216, 217 attached and marked Exhibit "Q"; Riddick N/T 175, attached and marked Exhibit "R")

## A. **Bogan/Hake**

### 1. **Joseph Kennedy, Project Manager**

There were 120 Bogan employees on the site. Keith Riddick was the only African American employed by Bogan. (Kennedy N/T 51, Ex. "F")

Bogan held daily meetings at the worksite attended by the Project Manager, General Foreman, Assistant General Foreman, Project Managers and Superintendents. At one of these meetings Anewalt raised the fact that Riddick complained to him of graffiti in the portable toilets on

the work site.  All the managers and superintendents at that meeting heard Anewalt's comment regarding Riddick's complaint.  (Kennedy N/T 58, 78, Ex. "F").  On several occasions Kennedy also discussed the graffiti with Chuck Carter, Charles Dunbar, James Coyle, Warren Riekel and Joseph Kane.  (Kennedy N/T 81-86, Ex. "F")

Anewalt testified that Joe Kennedy never talked to him about racial problems before or after Anewalt brought up Riddick's complaints at the meeting.  (Anewalt N/T 40, Ex. "M")

### 2. Charles Dunbar, Assistant Project Manager for Conectiv

Dunbar took care of cleaning the bathrooms.  (Kennedy N/T 72, Ex. "F")  He was present at the meeting during which Anewalt reported Riddick's complaints of racial graffiti. (Anewalt N/T 46, Ex. "M")

### 3. Terry Hartman, General Foreman

Keith Riddick came into the Bogan trailer and told Hartman and advised him he had a complaint.  At the time that Riddick came into the trailer to advise Bogan of his complaint, Richard "Butch" Anewalt, Assistant General Foreman, was present also.  Hartman asked Anewalt to take Riddick out on the deck and talk to him about the problem.  Anewalt returned and suggested that they bring the issue up to Joe Kennedy, Bogan Project Manager, at the daily manager's meeting.  The next day, Riddick's complaint about writings on the bathroom walls was discussed.

Kennedy advised that he was going to investigate.  (Hartman N/T 36-38, Ex. "L")

Anewalt discussed the matter with Plaintiff Riddick a couple of times, however, Hartman never talked to Riddick.  It was brought up at a couple of other meetings. (Hartman N/T 41, Ex. "L")

### 4.  Richard Anewalt, Assistant General Foreman

In May, 2003 Riddick said to Anewalt that there was graffiti in the bathrooms.  Anewalt replied "Is your name in the bathroom".  When Riddick replied no, Anewalt asked nothing further.

However, Anewalt did take the complaint to Terry Hartman and they took the complaint to a meeting with Joe Kennedy.  Neither Anewalt nor Hartman asked Riddick what the nature of the graffiti was.

In attendance at that meeting were Hartman, Anewalt, Kennedy, Mike Bondstein, Bogan management and Charlie Dunbar, Project Superintendent for Bogan.   Joe Kennedy stated that he would take care of the problem.  Anewalt figured that Kennedy would investigate it.  No one else made any comments. Anewalt never had any further conversations with any of those individuals relative to the problem complained of by Riddick.  (Anewalt N/T 42-50, Ex. "M")

5. **Joe Kane, General Foreman**

Kane was General Foreman.  He testified that Keith Riddick came to him on the job site and complained to him about a racial matter.  Kane said "Stop right there".  He took Riddick right to David Reichert, who was the highest Union official on the job and said "David Reichert, this is Keith Riddick, you have a problem" and Kane left.  Kane had to work, and therefore, felt it was not his business as to what Davie Reichert would do about it.  (Kane N/T 30-31, Ex. "C")

6. **David Reichert, Assistant General Forman/President of IBEW 375**

Reichert was an Assistant General Foreman and the Union President of the IBEW.  Anewalt testified that Reichert never came to him relative to any problem presented by Riddick.  (Anewalt N/T 42, Ex. "M")

7. **Rodney Haines, Steward for IBEW 375**

Haines was Steward for Local 375.  He was present when Riddick made complaints to Anewalt and Hartman.  (Anewalt N/T 65, Ex. "M")  Anewalt testified that Haines never talked to him about Riddick's complaints.  (Anewalt N/T 40, Ex. "M")

8. **William Newhard, Business Manager for IBEW 375**

Newhard is Business Manager for Defendant IBEW 375.  The Collective Bargaining Agreement (CBA) contains an antidiscrimination clause, but Newhard did not recall it.  (Newhard N/T 32, Ex. "G")  As

Business Manager he is to look into any violation of the CBA.   He has heard members use racial slurs, including the word "nigger". If there are violations, Newhard would hope that the steward would tell him.  He would want to know if his men are being subjected to racial discrimination, and would expect Anewalt to tell him.  Newhard would then contact the contractor and have them fix the problem.  (Newhard N/T 33, 34, 76, 107, Ex. "G")

There is writing in general on bathroom walls on all construction sites.  People write things on job johnnies everywhere.  He has seen it, but has never stopped to read it.   As a person he believes racial graffiti is wrong and should be corrected.   (Newhard N/T 59, 61, 65, Ex. "G")

During the project Riddick told him about the racial writing on the walls.  He and Riddick talked about what it meant to Riddick, who stated he found it offensive.  Newhard made no attempt to find out how the writing got there.  He was not sure whether black workers would be offended by the writings and believed it was up to the black members as to whether they are offended by the writing.  (Newhard N/T 67, 69, 77, 78, 79, Ex. "G")

Newhard told Kennedy, Bogan's Project Manager of Riddick's complaint.  Newhard told some other employee of Defendant Bogan that there was a problem and that they would have to take care of it.  Bogan

stated that they were going to try to stop it.  He doesn't know what Bogan did to try to stop it.  (Newhard N/T 73, 84, 86, Ex. "G")

Riddick told Newhard that there was a noose on the worksite. Newhard asked Riddick if his name was on it.  He has learned that a hanging noose is offensive to a black man.  They had a conversation about it, and Newhard then decided to talk to the men.  He told his men "whatever is going on there, it's got to cease and desist.  If our guys are part of it, stop it".  That was the extent of his involvement.  (Newhard N/T 77, 79, 80, Ex. "G")  (No deponent testified that Newhard talked to them about Riddick's complaint.)

### 7. **David Rompilla, Foreman**

Riddick told Rompilla about racially offensive graffiti on the toilets. Riddick was upset and bothered about it.  Riddick said "Those guys better do something about the shit on the walls".  Although Rompilla was a Foreman, he informed Riddick to report it to his supervisors.  Riddick told him that he had already reported the graffiti to his supervisors, and he was not happy with the results.  Rompilla recognized Riddick's statements were a complaint to him, but he did nothing to resolve it.  (Rompilla N/T 79-84, 87, Ex. "N")

## B. Ironworkers Union Local 36

### 1. Richard Frankenfield, Foreman

James T. Slater was the only black ironworker on the Conectiv site. (Frankenfield N/T 15, attached and marked Exhibit "S")

Frankenfield was President of Local 36.  He testified that all the portable bathrooms had graffiti.  Every bathroom he used had graffiti. Frankenfield was shown EEOC's Exhibit 1100 (Ex. "A").  He testified he saw the writing "JT equals dirty nigger".

Frankenfield was shown EEOC's Exhibit 1078 (Ex. "A").  He testified he saw the writing "who let that dirty (crossed out) nigger into Local 36". He takes that personally because he brought Slater into the Union. Frankenfield testified that he saw the racial graffiti shown to him in EEOC's Exhibits 1100 and 1078 when he was on the Conectiv site.

He never talked to Slater about the fact that his name was on the wall and it said "dirty nigger".  He believes it offended Slater because it offended him.  (Frankenfield N/T 30, Ex. "S")

He saw the word "nigger" and saw swastikas.  (Frankenfield N/T 29, Ex. "S")  At that time he was President of the union.  (Frankenfield N/T 23-25, Ex. "S")  He did not report to anyone that he saw those writings.

Frankenfield talked to other members of the union, but doesn't remember who.  He talked to Jack Flemish, who is a member of

Ironworkers Union Local 36.   Frankenfield asked Flemish, who did it and

he had no idea.  Flemish suspected Matt Groller, who is also in the

Ironworkers Union Local 36.  Frankenfield talked to Matt Groller about it,

and he denied it.  Frankenfield didn't talk to anyone else about it.

(Frankenfield N/T 26-28, Ex. "S")

## C. Dellovade

### 1. Charles Mann, Foreman and Union Steward

Both during his employment with Dellovade and his employment with

Steel Suppliers, Charles Mann was told by James Slater that there was

racial graffiti in the toilets.  When Slater asked him who was writing this

stuff, Mann said "I don't know".  Mann told him to take it up with Tony

David who was the Steward for the Ironworkers Union Local 36 at the time.

(Mann N/T 39, 66, 67, 68, Ex. "E")

Plaintiff James Slater also complained that he was given the hard

jobs and the worst jobs.  Mann told him if he didn't like it, he should just

quit.  (Mann N/T 97, Ex. "E")

Charles Mann reported James Slater's complaints to Herman

Beaulieu, the Dellovade General Foreman.  He knew Herman used the

bathrooms.  (Mann N/T 72, Ex. "E")   Mann and Herman talked about

discussions with the people they supervised.  (Mann N/T 68, 70, Ex. "E")

Herman advised Mann that Redbeard (Michael DelCasale) was

complaining that there is a lot of writings on the job johnnies and they

wanted it stopped.  Michael (Redbeard) DelCasale, the Project Manager

for Conectiv, was the only one with authority to stop it.  (Mann N/T 112, Ex.

"E")


## VI. <u>MEETINGS</u>

Defendant Bogan held daily meetings at the worksite attended by the

Project Manager, General Foreman, Assistant General Foreman, Project

Managers and Superintendents.  (Kennedy N/T 58, Ex. "F")

Joe Kennedy, Superintendent from Bogan, met with Bill Newhard,

Business Agent for Local 375, on two or three occasions on the job site.  At those

meetings they would discuss disputes between workers.  (Newhard N/T 26, Ex.

"G")

Dave Reichert was a General Foreman for Bogan.  He was also the Union

President for Local 375.  Newhard met with Reichert twice a month.  (Newhard

N/T 26, Ex. "G")  Newhard also met with other Business Agents, yet he never

discussed racial issues with them.  (Newhard N/T 92, Ex. "G").

Charles Wood, General Foreman for Steel Suppliers testified that Conectiv

held weekly meetings which were attended by foremen and superintendents from

every trade.  (Wood N/T 32, Ex. "B")  Conectiv had daily afternoon meetings to

discuss what happened that day and the plan for the next day.  All Conectiv

project engineers, DelCasale, Keyser, sometimes Kirby and construction representatives attended.  They never discussed the Grimes incident, any racial problems, or the existence of graffiti. (Gerwig N/T 82-84, attached and marked Exhibit "T")

All management level employees had the ability and opportunity to discuss the known existence of racial hostility.  They also had the means to eradicate it.


## VII. No Defendant took Action to Correct the Problem

### A. Bogan

#### 1. Joseph Kennedy, Project Manager

Kennedy was told that Riddick complained of graffiti in the portable toilets.  However, he never spoke to Riddick about the writing on the bathroom walls even though he knew that Riddick was the only African American electrician on the job site for Bogan.  He never asked Anewalt or Riddick whether the writing had anything to do with race.  Kennedy never asked Anewalt what it was that Riddick took offense to.  Kennedy doesn't know whether he ever talked to Anewalt about it again.  He did not ask Anewalt if there was any specific portable toilet that the writing was in. He never asked what the writing was.  He never investigated any toilets to check for racial graffiti.

Although he thought all the writing in the bathrooms was inappropriate, the only thing Kennedy did in response to the complaint was to tell the General Foreman, Terry Hartman, that if anybody was caught writing in the bathroom they would be terminated.  Hartman denies the discussion and never took any action.  The writing continued to appear.  It would be taken off in the morning and would reappear in the afternoon. Kennedy had no idea as to what else he could do.

The writing continued until the end of the project.

Kennedy did nothing else. (Kennedy N/T 64-69, 145-147, 150, Ex. "F")

### 2. **Terry Hartman, General Foreman**

Although Riddick complained to Hartman, other than telling Anewalt to talk to Riddick, and bringing it up at several meetings, he did nothing else.  He never talked to Riddick or any other black worker on the site or any other worker.  He had no knowledge of anything ever being done about the graffiti.  He knows of nothing that Bogan did to correct the problem.  There was never any posting on the bathroom walls indicating not to write on the walls.   He never noticed whether the problem resolved. (Hartman N/T 41, 42, 46, Ex. "L")

### 3. **Joseph Kane, Foreman**

Kane made no efforts to find out the nature of the racial problem about which Riddick complained.  Kane did not alert anyone else from Bogan or otherwise about the racial problem.  He did not inform anyone under him that there was a racial issue.  He never told his men to stop the graffiti or asked them if they knew anything about it.  (Kane N/T 63, 64, Ex. "C")

Kane denied that Newhard, Anewalt, Hartman or Kennedy ever talked to him about Riddick's complaints or any racial problem.  He was not part of any discussions relative to racial graffiti, slurs or problems. (Kane N/T 37-40, Ex. "C")

### 4. **Richard Anewalt, Assistant General Foreman**

Other than reporting complaints by Riddick to Joe Kennedy and other management officials of Bogan and Conectiv, Anewalt did nothing further.  He never discussed the matter again with Kennedy, Hartman or anyone.  He never asked if there was an investigation or if anything had been done about the problem.  He never looked himself to see what graffiti Riddick was complaining about.  He never asked Riddick which bathrooms contained the graffiti.  He didn't wonder which bathroom it was.  He never went back to Riddick to ask if the problem was fixed.  Although there were foremen meetings weekly, which included every foreman on the site, there was never a meeting that discussed the possibility of a racial problem on

31

the site.   Anewalt never did any investigation into Riddick's complaints. (Anewalt N/T 50-53, 55, 60, 62, 73, Ex. "M")

### 5.  David Rompilla, Foreman

When Riddick complained to him about the racial graffiti on the wall, he seemed upset.  However, Rompilla's reaction was "If he's complaining about it, why would I want to go there and get involved?"  (Rompilla N/T 99, Ex. "N")

## B.  IBEW 375

### 1.  William Newhard, Business Manager

After Riddick complained to Newhard about the racial graffiti and the noose, Riddick asked Newhard to get it stopped.  He told Riddick that he would look into it, or have the guys look into it.  Newhard believed that the problem was that they do not have control over the whole work site. (Newhard N/T 80, 81, 194, 195, 196, 199, Ex. "G")

Newhard claims that he told Dave Reichert and Terry Hartman about the complaints and told them they should do anything they could to stop it. He expected them to go to their people.  He told them to go to their foremen and make sure it goes out to everyone.  He believes they followed through with these instructions because the journeymen and apprentices on the job talked about it.  He believes people were told to stop writing in

the bathrooms. However, he does not know if in fact that was done. (Newhard 81-82, 87, Ex. "G")

In fact, Newhard never talked to anyone, because Hartman, Reichert and every other foreman on that site denied that Newhard ever talked to them. Terry Hartman testified that Newhard never told him to talk to the men on the site about the graffiti (Hartman N/T 49, Ex. "L") Anewalt testified that Bill Newhard never talked to him about any racial problems or racial graffiti. He did not know that Newhard said that Riddick had complained to him, and that the foremen should make it known to other members of the local. He was never told to take steps to insure the harassment would cease. (Anewalt N/T 72, Ex. "M")

Newhard believed it was his job as Business Manager to do the investigation. In fact, Local 375's Answers to Interrogatories state that the Business Manager would be responsible for overseeing the investigation. (Newhard N/T 94, 99, Ex. "G")

Newhard testified that the stewards are taught to talk to every member. He probably asked Reichert and Hartman or the steward if they had seen any racial graffiti, but he doesn't remember what they said. He asked them if they saw racial symbols, but he doesn't recall their answers. (Newhard N/T 97-98, Ex. "G")

Newhard never talked to DelCasale. (Newhard N/T 93, Ex. "G")  He never went to the worksite to see if he could see any racial problems. (Newhard N/T 101, Ex. "G")  There was no investigation.  Newhard had no idea whether the writing stopped.  He did not investigate.  (Newhard N/T 83, 84, Ex. "G")

## C.  Steel Suppliers

### 1.  Charles Wood, General Foreman

He doesn't think you could do anything about the graffiti.  It is ignorant, but there is nothing you can do to stop it.  Writing in the bathroom is standard procedure.  It has been going on for 35 years.  (Wood N/T 62, 63, Ex. "B")  Graffiti on construction sites is common.  (Wood N/T 99, Ex. "B")

## D.  Conectiv

### 1.  Robert Keyser, Construction Manager

Conectiv took no affirmative or proactive steps to ensure that the workplace was free from harassment for African-Americans on the job site. (Keyser N/T 86, Ex. "K")    After the Roy Grimes incident concerning racial slurs, Conectiv did not talk to the project engineers or construction representatives to tell them to speak with the prime contractors regarding any problems with racial harassment of discrimination. (Keyser N/T 86, 87, Ex. "K")

34

**VI.    ALL DEFENDANTS FAILED TO PROPERLY TRAIN MANAGEMENT OR SUPERVISORS TO IDENTIFY, REPORT OR RECTIFY RACIAL HARASSMENT**

**A.  Bogan/Hake**

### 1.  Joseph Kennedy, Project Manager

Prior to January 2006, Kennedy never received training on the Bogan racial discrimination and harassment policy.  (Kennedy N/T 25, Ex. "F")  Conectiv provided no training.  (Kennedy N/T 38, 98, Ex. "F")  Bogan had a policy that racial discrimination would not be tolerated.  He read it once.  The men in the field were to be advised of the policy through their foremen.

He knew of no document from Bogan that indicated that he should record complaints of discrimination and harassment received by him.  Nor was he told by anyone to do that.

### 2.  Terry Hartman, General Foreman

Terry Hartman took the National Contractors Association course in managing people.  He got some training on sexual harassment, but does not remember what he was taught.  He was not taught how to investigate an allegation of harassment.  (Hartman N/T 19, Ex. "L")

He did not know how Bogan wanted him to report racial harassment. (Hartman N/T pg. 21, Ex. "L")  He was given a book on safety issues by

Bogan, but there was no training along with the book.  He was told to page through it.  He does not remember the details.

As a result of the inadequate training, Hartman had no idea what to do with the complaints brought to him by Riddick.  He believed there was nothing that he could do about the problem and that it had to "move up the chain of command".  Although he believed that racial comments would bother the black workers, he believed that telling Kennedy was sufficient action, even if he had no knowledge of any action taken by Bogan.  He was General Foreman on this job and he never even took the time to talk to Riddick to see if his complaints were resolved.  He had no idea who could do anything about the writing on the bathroom walls.  He admits it is still a problem on all jobs, and does not know what the answer is.  He admits, "it is not right, but I don't know what the answer is to fix it".  (Hartman N/T 42, 43, 44, 45, Ex. "L")

Although Hartman had been a member of IBEW 375 since 1978 and has been a foreman since 1992, he had no idea how to report a grievance.  He doesn't know any actual procedure or paperwork to fill out in order to file a grievance.  He doesn't know anything about the Collective Bargaining Agreement, does not remember the Union Bylaws, and does not know if the Constitution says anything about discrimination.  (Hartman N/T 62, 63, Ex. "L")

### 2. **Richard Anewalt, Assistant General Foreman**

Since Riddick's name was not on the walls, and because every job site that he ever went on had graffiti in the bathroom, he did not think that it was important as to where the graffiti was located.  (Anewalt N/T 54, Ex. "M")

The Union never offered any training in racial harassment or discrimination.  Bogan never gave him any training.  The only training he knew was to take complaints to a supervisor.  (Anewalt N/T 74, Ex. "M")

### 3. **David Rompilla, Foreman**

Other than a video that was shown to him by another contractor in 1994, David Rompilla never received any training on racial harassment. He does not even recall whether that video addressed racial harassment. (Rompilla N/T 20, Ex. "N")  He received no training from the Union. (Rompilla N/T 83, Ex. "N")

Bogan did not supply him with documentation of their policies nor did they teach him how to identify a complaint of racial harassment.  (Rompilla N/T 83, Ex. "N")

He did not understand Riddick's complaints to be an issue.  There was graffiti in all the bathrooms about Rompilla and his brother butt f---ing. The workers write graffiti to get under the other one's skin.   He knew

Riddick was upset.  The way Rompilla dealt with it was to do nothing.  He did not want to get involved.  (Rompilla 85-87, Ex. "N")

### 4. Joseph Kane, Foreman

The only training Kane received on how to report racial harassment was to bring it to the attention of a supervisor, which he did.  As to whether he should advise a union steward – it's whoever you see first.
He never got any training on how to investigate a complaint of racial harassment.  The Union has not provided any training on those issues since 1988 or 1989.  (Kane N/T 48, Ex. "C")

He did not understand that as a Foreman it was part of his responsibilities to make sure that the workplace was free from racist signs or symbols.  No one told him that it was his responsibility.  He understood his responsibilities to be only production.  (Kane N/T 56, 57, Ex. "C")

## B.  IBEW Local Union 375

### 1. William Newhard, Business Manager

Newhard claims that he received some training from the Union, however, he does not remember where.  The Union never gave him a book on racial harassment training, and he received no training on investigating claims of racial harassment.  (Newhard N/T 112, 114, 116, Ex. "G")  He never attended a meeting where racial harassment at the Conectiv site was discussed.  (Newhard N/T 116, Ex. "G')

## C. Steel Suppliers

### 1. Charles Wood, General Foreman

Charles Wood never received training from the Union or anyone else on racial harassment and discrimination.  He was never trained as to how to report it, recognize it, or investigate it.  (Wood N/T 80, 81, Ex. "B") Defendant Steel Suppliers never gave him a handbook regarding such matters.  He was never given anything that outlined Defendant's policies or procedures.  (Wood N/T 79, 98, Ex. "B")

### 2. William Thomas, Foreman

Mr. Thomas does not believe that it would be his obligation as Foreman to report racial graffiti to anyone, or to talk to his men about it. He does not believe it would be his employer's obligation to remove it. (Thomas N/T 33, 34, Ex. "H")

Thomas never received any training on how to identify racial discrimination or harassment or how to report it.  He never read anything in the handbooks about racial harassment.  (Thomas N/T 46, 47, 49, 60, Ex. "H")

### 3. Charles Mann, Foreman

Charles Mann never received training from Steel Suppliers or the Union as to how to identify racial harassment or how to handle complaints of harassment.  Even though he was a Union Steward, he worked on the

site for Dellovade as a Foreman and never received any training from them as to how to identify or handle racial harassment.  (Mann N/T 31-33, Ex. "E")

### 4.  Anthony David, Foreman and Union Steward

Steel Suppliers nor Local 36 ever provided Anthony David with any training on issues of racial harassment.  He never received any training on how to identify racial harassment or how to report complaints of racial harassment or discrimination.  (David N/T 33-34, Ex. "D")

### 5.  Robert Kilpatrick, Business Manager, Ironworkers Union Local 36

The Union did not provide training to its members.  There has been no sensitivity training provided by the union.  Kilpatrick has not received any training of any kind on how to identify racial discrimination or harassment.  (Kilpatrick N/T 34, 35, Ex. "I")

### D.  Conectiv

### 1.  Michael DelCasale, Project Manager

Michael DelCasale has not been given, nor has he seen Conectiv's harassment policy.  He does not recall if Conectiv's handbook had a section dealing with harassment.  (DelCasale N/T 216, attached and marked Exhibit "U")

DelCasale does not recall if he ever got training on identifying or dealing with racial or sexual harassment or discrimination on the job site.

40

(DelCasale N/T 142, Ex. "U")  DelCasale was never trained how to investigate a complaint of racial harassment.

### 2. **Robert Keyser, Construction Manager**

Conectiv never provided training on harassment to any of the prime contractors on the Bethlehem project. (Keyser N/T 77, Ex. "K")

After Grimes' complaint that he was called a racial slur, Conectiv did not advise contractors, primes or subcontractors about Conectiv's harassment policy (Keyser N/T 84, Ex. "K").  They did not discuss Conectiv's anti-discrimination or anti-harassment policies during any meeting.   They never contacted any African American employee on site to determine if there were any other incidents of racial problems.  Keyser believes that he had the responsibility to make sure that the job site was free from racial harassment (Keyser N/T 85, Ex. "K")


## VII.   <u>LIABILITY</u>

### A. <u>International Brotherhood of Electrical Workers Union Local 375</u>

IBEW's Union Constitution Article 17, page 52, attached and marked Exhibit "V" states:

> "The President shall be held responsible for the strict enforcement of this Constitution and the rules herein."  Dave Reichert was President of Local 375 and therefore would have been responsible for enforcing the Constitution.  (Newhard N/T 180, Ex. "G")

Any member may be penalized for committing a violation of the rules or Bylaws or working agreements or rules of a Local Union.  (Newhard N/T 181, Ex. "G") (IBEW Constitution article 25, page 71)
Anyone having knowledge of violations yet failing to file charges or to notify the proper officers of the local union can be suspended or expelled.  (Newhard N/T 182, Ex. "G")

On September 12, 2002 Business Manager, William Newhard, received a complaint at the union hall from Keith Riddick regarding racial harassment at the Conectiv job site.  Newhard made the complaint known to two members of IBEW's Local 375 David Reichert and Terry Hartman, who were both General Foremen at the job site.  Reichert was President of the Union.  (Newhard N/T 81, Ex. "G")

The Union Business Agent, the Union President and the Union Stewards all failed in their duty under the Constitution and Bylaws of the International Brotherhood of Electrical Workers Union Local 375.

## B. Ironworkers Union Local 36

The Constitution of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers sets the standard for Local 36.

### 1. The Constitution

The Ironworker's Union Constitution states that no one can be admitted, if they are opposed to the Constitution of the United States of America.  It states that charges may be preferred against any local union officer or member for wronging a member of the association.  (Ironworker's Constitution, Article II, attached and marked Exhibit "W")  The Constitution

42

further states that the duties of the President shall be to enforce this Constitution.  Special meetings may be called by the President or the executive committee.  (Frankenfield N/T 54, Ex. "S") (Ironworker's Constitution, Article XXVI Section 2, Ex. "W")

Richard Frankenfield was President of the Ironworker's Local 36, and did not call a special meeting to talk about racial graffiti, even though he was personally aware of it.  Frankenfield knows of no memos, word of mouth or anything that informed people not to write in the bathrooms. (Frankenfield N/T 56, Ex. "S")  With the help of his stewards the Business Manager assures that his members are treated fairly.  As a Business Manager he handles grievances.  (Kilpatrick N/T 8, Ex. "I")

Robert Kilpatrick, Ironworker's Local Union 36 Business Manager, testified that he has seen graffiti on the bathrooms walls on worksites in probably every job-johnnie that he ever used.  It is a fact of life.  (Kilpatrick N/T 30, Ex. "I")  Having seen racial graffiti on other sites he never went to this site to monitor whether there was any graffiti because he was never asked.  He never asked any of his men to do that.  (Kilpatrick N/T 33, Ex. "I")

The Ironworker's Constitution Article XXVI, Section 2 page 96 sets forth the duties of the President of Local 36 (Ex. "W").  Paragraph 2 states the President must enforce the Constitution.  The President has a duty to

43

be aware of the Constitution and to uphold it.  It is the policy of the Union
not to discriminate against its members.  Frankenfield, as President should
have known that, and should have reported the discrimination.  (Kilpatrick
N/T 47-50, Ex. "I")

Frankenfield testified that if a problem presents itself the men should
first go to the steward who would come to Robert Kilpatrick or Frankenfield
to resolve the issue.  (Kilpatrick N/T 34, Ex. "I")  If Anthony David, Steel
Suppliers Foreman and Union Steward, saw the writing on the walls and
did not report it, he would have been remiss in his duties.  (Kilpatrick N/T
42, Ex. "I")  Section 5 article 2, page 6 of the Constitution states that any
member who discriminates in any manner against any other member or
who violates any provision of the Constitution or who prevents any other
member's full enjoyment provided by the Constitution may be expelled.
Section 6-B, page 99 of the Constitution gives the Business Manager
authority to discipline anyone who violates the bylaws and the Constitution.
(Kilpatrick N/T 43-44, Ex. "I")  Slater went to his steward and Frankenfield
had first hand knowledge.  There was no resolution.

The Business Manager, the President and the Stewards all failed in
their duties under the Constitution and Bylaws of the Ironworkers Local 36.

## 2. The Collective Bargaining Agreement

The Collective Bargaining Agreement for Local 36 dated from July 1, 2000 to June 30, 2003, (attached and marked Exhibit "Z") states, on page 16, "Parties agree to comply with State and Federal laws, regulations and rules guaranteeing civil rights and liberties to all persons."  As a Business Manager, Kilpatrick had a duty to adhere to the Collective Bargaining Agreement.

The steward is the liaison between the contractor, the men on the job and the Business Manager in the union office. (Collective Bargaining Agreement, pg. 23, section 2, Ex. "Z")  If the steward becomes aware of problems he cannot adjust, he must report it to the Business Manager.  "A steward failing to fulfill his duties shall be subject to censure by the Union and subject to a penalty upon conviction." (CBA Article IX, Section 2, pg. 22, Ex. "Z")  (Kilpatrick N/T 37-40, Ex. "I")

The President, the Business Manager and the Steward failed in their duties under the Collective Bargaining Agreement.

Both the IBEW Local 375 and the Ironworker's Local 36 discriminated in their duties.  David Reichert was the General Foreman for Bogan and a Union President of Local 375.  Charles Mann was Foreman for Steel Suppliers and a Union Steward for Local 36.  Anthony David was a Foreman for Steel Suppliers and a Union Steward for Local 36.  Richard Frankenfield was Foreman for Steel Suppliers and President of Local 36.  When Union officials assume responsibility

45

for the type of workplace conditions that give rise to discrimination, they have

crossed the boundary separating the company's domain from the Union's.  The

Unions were not free to turn a blind eye to the racial graffiti that was staring these

officials in the face.

Therefore, both Ironworkers Union Local 36 and the International

Brotherhood of Electrical Workers Union Local 375 are liable for their failure to

recognize and rectify the discrimination complained of by their African American

members in the same way they resolve complaints made by their non-minority

members.

### C. Conectiv

### Conectiv Has Responsibility and Liability as an Employer

The term "employer" has been construed liberally under Title VII, and does

not require a direct employer/employee relationship.  See Gryga v. Ganzman,

991 F.Supp. 105, 108 (E.D.N.Y. 1998)

Under the common law, the existence of an employer/employee

relationship depends upon a variety of factors, any one of which may be

controlling.  These factors may include:

      1. Right to control and supervise the manner in which the labor is
performed;

      2. Ownership of the tools or equipment needed to perform the work;

      3. Ownership of the premises at which the work is performed;

    4.  Responsibility for the expenses involved;

    5.  Relationship of the work to the regular business of the recipient;

    6.  Manner of payment;

    7.  Right to hire and fire;

    8.  Offering of services to the general public rather than the individual concern; and

    9.  Custom in the trade.

Michael DelCasale was Conectiv's Project Manager.  He walked around that site every day.  He instructed the foremen of prime contractors on where, when, and how work was to be performed.  Terry Hartman, General Foreman for Bogan testified that DelCasale could have told him to do anything.  He would see Hartman on the field and he would simply say "Take care of this."  If you did something wrong, he went to your foreman.  He ran the show.  (Hartman N/T 51, Ex. "L"; Thomas N/T 35, 37, Ex. "H"; Soto N/T 21, Ex. "J"; Frankenfield N/T 33, Ex. "S")

Redbeard (Michael DelCasale) had the ability to remove people from the worksite.  Hartman knows that there were guys that were fired at Redbeard's order.  One was a Bogan worker who was "fired because he was not performing the job in the manner that Mike thought he should."   (Hartman N/T 65, Ex. "L")

Kennedy testified that Conectiv would give Bogan instructions as to what needs to be done and what they should do.  Conectiv would tell them which

areas were critical to get people into.  Conectiv basically coordinated the
complete construction site.  (Kennedy N/T 93-94, Ex. "F")

Hartman was surprised that Conectiv managed the site themselves since
most companies hire a construction management company.  "Most companies
don't build their own buildings or build their own places."  Conectiv would tell
trades "who could go into certain areas, at what time, what gets done first, what
would get done second."  (Hartman N/T 65, 66, Ex. "L"; Thomas N/T 37, Ex. "H")

Anewalt testified that it was Redbeard's job to run the entire job and make
sure that everything was going properly and everything was moving along.  He
saw Redbeard on the job every time he was out there.  (Anewalt N/T 68, Ex. "M")
Charles Wood testified that "anything to do with that job, DelCasale made the
decisions."  "He runs the job."  (Wood N/T 58, Ex. "B")

DelCasale was commander and chief.  He was top man on the job.  Wood
testified that DelCasale was the only one on the job over him.  DelCasale told
him to terminate a guy who was caught urinating on equipment.  Wood did what
DelCasale told him to do.  (Wood N/T 58, 61, 84, Ex. "B")

Charles Mann testified that Redbeard was the "head man for the
organization so things worked smoothly for the entire project."  If there was
anything that needed to be done, "men would have to go to Redbeard to get
clearance."  "He was the guy to see."  (Mann N/T 59-62, Ex. "E")

Mann knew that Redbeard had the ability to remove people from the site. There was an incident when Herman Beleiu, General Foreman for Dellovade, was temporarily replaced by Gene Anders.  Mann was standing near Anders when he got on the radio and said to Roy Grimes "Where the fuck are you?  Get your fucking ass down here."  Actually Grimes was within hearing distance. While leaving the radio on, Anders said "That stupid nigger."  Everyone who had a radio heard it, including Grimes.  (Mann N/T 56, Ex. "E")  Grimes reported the incident to his job steward who brought the matter to Redbeard.  Redbeard contacted Dellovade and had Anders removed from the job site.  (DelCasale N/T 117-120, Ex. "U")

Anthony David testified that Redbeard was the individual who had men fired.  Redbeard caught two of Steel Suppliers employees guys not tied off and had them fired.  (David N/T 50-52, Ex. "D")

Kilpatrick, Local 36 Business Manager, testified that Conectiv oversaw the entire project from start to finish.  They coordinated all the trades.  They gave input as to the progress and quality of the work.  They enthusiastically complimented the Ironworkers on the way they were doing their job.  (Kilpatrick N/T 20, 21, Ex. "I")  "The buck stops with DelCasale."  (Kilpatrick N/T 27, Ex. "I")

Robert Keyser, Conectiv's Construction Manager testified that Conectiv's project engineers were responsible for the prime contractors and Conectiv's construction representatives assisted the project engineers.  Keyser oversaw

construction quality and field coordination. (Keyser N/T 42, Ex. "K"). He was responsible for the general housekeeping of the site, general quality of construction and general access available for all contractors throughout the job site. (Keyser N/T 43, Ex. "K"). Keyser was responsible for obtaining equipment for the project and responsible for maintaining the construction schedule. He would advise the prime contractor when work was not satisfactory. (Keyser N/T 44, 45, 59, Ex. "K")

### D. Joint Employer

The existence of a joint employer relationship depends on the control which one employer exercises over the labor relations policy of the other. The National Labor Relations Board has stated that to establish joint employer status there must be a showing that the employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision and direction. Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund, et al., 632 F.Supp. 630 (S.D.N.Y., 1986)

Conectiv has fired, disciplined, supervised and directed the workmen on this job site and should be considered a joint employer.

The "joint employer' concept does not depend upon the existence of a single integrated enterprise. Rather, a finding that companies are "joint employers" assumes in the first instance that companies are "what they appear to be" – independent legal entities that have merely "historically chosen to handle

jointly important aspects of their employer-employee relationship."  "[I]t is rather a matter of determining which of two, or whether both, control, in the capacity of employer, the labor relations of a given group of workers."  The basis of the finding is simply that one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.  Thus the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.  N.L.R.B. v. Browning-Ferris Industries of Pa., 691 F. 2d 1117 (C.A.3., 1983)  Citations omitted.

### E. Employer

The question of whether an entity is an employer of the persons at issue under Title VII of the Civil Rights Act of 1964, as amended, 52 U.S.C.S. §2000 et. seq., is a legal conclusion which involves an application of the law to the facts. The issue turns heavily on the question of control.  If an employer has the right to control and direct the work of an individual not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.  EEOC (Ferguson) v. Foster Wheeler Constructors, Inc., et al. 1999 WL 528200  (N.D. of Ill., 1999).  While

Title VII contemplates some employment relationship, this relationship need not link together the plaintiff and the defendant.

In the case of <u>Ferguson v. Foster Wheeler</u>, Defendant promulgated a policy and response to racially offensive graffiti at the work site. Violations of the prohibitions against graffiti were to be brought to the attention of *Foster Wheeler* who would take certain actions, including requiring the employee's removal and ban from the site. Such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignment and issuance of operating instructions is part of the control test.

The <u>Foster Wheeler</u> case discusses the instance when an employer has employees and independent contractors working on the same site and the independent contractors were racially harassing the employees. The Court considered, if the employer knew of the harassment, but did not act to stop it, could the employer raise as a defense to a discrimination lawsuit by the employees that it was up to the employer of the harassers? The Cour t stated that in the absence of an employer/employee relationship with the putative plaintiffs, *Foster Wheeler* could be found liable for discriminatory conduct that interfered with the employment conditions enjoyed by the subcontractors' employees.

The Foster Wheeler Court looked first to the language of the statute at issue.  The relevant portion of Title VII states that "it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color religion, sex or national original.  The Court quoting Sibley focused on the use of the term "any individual" a much broader term than the word "employee", which could have been used to protect a smaller class of persons.  Sibley Memorial Hospital v. Wilson, 488 F.2d at 1341 (C.A.D.C., 1973).  See also, Bender v. Suburban Hospital, Inc., 159 F. 3d 186, 188 (C.A.4, 1998).  Every Court of Appeals to consider this question has followed the lead of the District of Columbia Circuit Court in allowing such a claim.  While Title VII contemplates some employment relationship; this relationship need not link together the plaintiff and the defendant.  Vakharia v. Swedish Covenant Hospital, 765 F.Supp. 461, 463 (N.D. Ill., 1991).  The Foster Wheeler Court concurred with that interpretation of 52 U.S.C.S. §2000e-2(a)(1).  The Foster Wheeler Court applied the Sibley interference theory to find that subcontractors' employees who were employed by Title VII employers may sue Foster Wheeler for interfering with conditions of their employment.

This question was again addressed in 2005 in Kaciak v. The New York Vista, 2005 WL 524575 (S.D.N.Y., 2005).  Title VII defines the term employer as

"a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. §2000e(b). Courts have construed the term "in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless, control some aspects of an employee's compensation or terms, conditions, or privileges of employment." Gryga v. Ganzman, 991 F.Supp. 105, 108 (E.D.N.Y., 1998), citation omitted.

The Kaciak Court stated that it is well established in the common law tort context that, although corporations can regulate how liability will be allocated among themselves, they cannot alter a third party's right to sue.   This reasoning is equally applicable in the context of a statutory tort such as Title VII.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 264, 109 S.Ct. 1775 (U.S.Dist.Col., 1989).

F. **Testimony of Michael DelCasale**

Michael DelCasale testified that his duties as project manager included:

1. Overseeing the permitting process, procuring the equipment for use on the site, issuing the contracts and checking the quality control of the contracts, observing construction and then the setting up and commissioning of the equipment.

2.  Watching the construction activities, making sure that the work was done safely, making sure that the quality and specifications required were achieved.

3.  Walking around the site observing contractors' performance, looking for safety violations, looking at job progress, looking at the quality of work that was executed and intermingling with the project engineers and construction representatives on the staff.  (DelCasale N/T 25, Ex. "U")

4.  Contacting the project engineer on the Conectiv staff and asking them to contact the superintendent for the contractor if the work was not satisfactory.

5.  Taking action by stopping the job if there was a violation.  If there was an immediate harm, asking the contract employees to stand down until their foreman came to stop them, then directing the contractor to correct the violation.  (DelCasale N/T 31, Ex. "U")

Conectiv kept in excess of 25 employees on the worksite.  There were six Project Engineers whose duty it was to administer the project.  It was part of the Conectiv Project Engineer's job to be sure that the contractors fulfilled their obligation under their contract.  These Conectiv representatives were assigned to each contractor and would be contacted for any problems relating to the job and Conectiv's procedures and policies.  (DelCasale N/T 26, 32, 148-150, Ex. "U")

Conectiv representatives' had to ensure the right materials were being used. They had to review submittals for material purposes and provide comments back. They made sure that work that was being done was meeting the quality standards that were required by the specifications. They had to ensure that the work was done, and the worker's maintained a schedule that was agreed upon or included in the contract.

Injuries on the job had to be told to Conectiv. All vehicles on the job had to have an approved permit issued by Conectiv. Problems encountered by the trades would be raised to the project engineer who would bring the problem to DelCasale. (DelCasale N/T 150, 179, Ex. "U")

Neil Gerwig, Project Engineer and Construction Representative for Steel Suppliers and Bogan, testified that Conectiv would deal with Cives, the prime contractor for Steel Suppliers as to meeting their scope of work. The overall direction would be how to meet their scope of work and support the overall project. Conectiv would oversee to ensure that milestones were met. They would direct the overall contract on the work schedule and hours of work that they would be on site. Conectiv would work with the prime contractor to determine what hours of work would be appropriate for them. Conectiv would tell the prime contractor what needed to be done, and it would be up to him to pass it down to his subcontractor. (Gerwig N/T 79-81, Ex. "S")

Neil Gerwig would look at the quality of work and make sure that the work matched the design drawings.  He would go around with the Cives site manager and inspect the work and have a punch list of work that was not satisfactory and that needed to be corrected.  He would tell Cives what was wrong and explain the way it should be.  (Gerwig N/T 89-90, Ex. "S")

There were instances where a contractor asked permission to use an alternative method or alternative design and they would ask Conectiv's permission – 'can we do it this way' – and Conectiv would review what they were proposing and decide whether it is satisfactory or not.  (Gerwig N/T 91, Ex. "S")

Conectiv also had a direct contract with Steel Suppliers and they would interact with Charles Wood, General Foreman directly.  Neil Gerwig could take a drawing to Steel Suppliers and say – "this problem came up, this is what we want changed, this is what we want done and Wood would direct them to do the work as part of their contract, part of that miscellaneous steel contract."  (Gerwig N/T 100, 101, Ex. "S")

### G.  The Project Labor Agreement and Terms and Conditions Contract

Michael DelCasale testified that every contractor that was going to be working on the site had to sign the Project Labor Agreement or they would not be permitted to work.  The Terms and Conditions governed the contracts between Conectiv and the prime contractors. (Keyser N/T 119, 120, Ex. "K").  The purpose of the agreement was to insure that the construction of Conectiv's Bethlehem

Project would proceed efficiently, economically, and within Conectiv's

construction schedule, that there would be no work stoppages, that there will be

a uniform holiday schedule and that the job site hours will be worked and set by

this agreement.  This Agreement was created "for Conectiv's benefit."  (PLA at

Article I, attached and marked Exhibit "X")

The page marked SCE-1 of the Terms and Conditions (attached and

marked as Exhibit "Y") sets forth Project Rules – "The purposes of the project

rules is to govern conduct of the contractor's employees while on the property of

the owner.  Page GC-8, paragraph 16 of the Terms and Conditions requires of all

prime and sub contractors compliance with laws.  The Terms and Conditions

Agreement page GC-10 in paragraph 25.1 states, among other things, that the

contractor represents and warrants that they will abide by equal employment and

all State and Federal laws dealing with race discrimination.  (DelCasale N/T 151,

158, 159, Ex. "U")

Michael DelCasale agrees that he could have taken action on racial graffiti

in the portapotties.  He could have found out whose portapotties they were,

identified them by serial number, contacted the rental agency, found out who

they were and had the contractor who was responsible for that portapotty clean it

up, paint it over, and take immediate action. (DelCasale N/T 107, Ex. "U")

DelCasale took action when he learned that Gene Anders, a Steel Suppliers'

General Foreman called Roy Grimes a nigger.  He demanded that Anders be

fired and removed from the site. DelCasale considered Anders a nonconformist to the contract. (DelCasale 117-120) DelCasale had Charles Wood fire a Steel Suppliers employee who urinated on equipment. He had two Steel Suppliers' employees fired for not being tied off. (David N/T 50, Ex. "D") He had Kennedy remove two Bogan employees on the site for failing to work in a manner he approved. (DelCasale N/T 135-137, Ex. "U")

After the meeting Gerwig had with Keyser, DelCasale and Coglin, relative to the Grimes issue, Gerwig had no other involvement in either dealing with that issue or making sure that it didn't happen again. (Gerwig N/T 52) He knew there was an harassment issue and knew it was racial, but did not know any details of what was said or done, even though it was his responsibility to be sure the PLA and the Terms and Conditions contract were adhered to. (Gerwig N/T 94, Ex. "S") He did not know if the information that the behavior would not be tolerated ever went down to the ranks. He did not do anything personally to see that the word was circulated. (Gerwig N/T 96, Ex. "S")

Therefore it is established that Conectiv had the power and authority to take action relative to discrimination on that worksite. However, even the one time that they exercised that authority they failed to take proper steps to insure that harassment would stop and never happen again. Numbered paragraph 25 on page GC-10 of the Terms and Conditions is titled Nondiscrimination. It was also part of Gerwig's duties and responsibilities to ensure that this particular

paragraph was complied with.  (Gerwig N/T 57-18, Ex. "S")  In the first line of paragraph 25, it says "In performance of the work hereunder, Contractor shall comply with all federal, state, and local regulations relating to discrimination." Neil Gerwig took no steps to inform CH Schwertner, the prime contractor for Dellovade, what the federal nondiscrimination laws were; nor did he make any efforts to satisfy himself that they had a copy of the federal nondiscrimination laws; nor did he take any steps to make sure that they had copies of any applicable state or local regulations relating to nondiscrimination.  (Gerwig N/T 59, Ex. "S")

## H.  Conectiv Had the Ability to Control the Worksite through the PLA and Terms and Conditions Contract

The Terms and Conditions GC-6 Section 12 States: – "Owner may, upon written notice to contractor, terminate this contract, or any part thereof, at any time, without liability, except for obligations or liabilities due for services rendered prior to the effective date of termination, for the following causes:  (under C) if contractor disregards any laws, ordinances, or governmental regulations (Page GC-8, paragraph 16, Ex. "Y").  (DelCasale N/T 157, 159, Ex. "U")

Michael DelCasale's testimony makes it clear that it was Conectiv's intent to have the ability and the authority to determine what workers would remain on the site.  They retained the ability to fire anyone they believed was doing something improper.  DelCasale further confirmed the fact that it was proper to bring complaints to him for action.  As previously indicated, all trades realized

60

that DelCasale was the decision maker with such terms as "the go to man", "the guy in charge", "the guy that ran the show". DelCasale testified that it was proper for the steward to come to him with the information relative to sexual harassment. It was a path for him to get resolution on that matter. (DelCasale N/T 124, Ex. "U") An aggrieved employee goes to his steward. The steward has two paths – go directly to Conectiv, or go to the Business Manager, who would then come back either directly to the contractor or to Conectiv. (DelCasale N/T 144, Ex. "U")

However, when it came to the issue of the racial slurs written all over every portable bathroom on the site, the racial jokes, and the open symbols of racial hatred, DelCasale never investigated the matter or took any action whatsoever, even though he admitted his awareness of the existence of the graffiti.

The Project Labor Agreement and Terms and Conditions provided Conectiv the ability and duty to dismiss any contractor who failed to follow the State and Federal laws dealing with race discrimination. They failed in that duty.

There is no doubt that Conectiv owned the premises at which the work was performed, was responsible for the expenses involved, decided hours worked, had the right to fire, supplied equipment, and controlled and supervised the manner in which the labor was performed. They were an employer in total control of that worksite and in that capacity they permitted an open and obvious hostile environment for African American workers to continue to work.

## VIII.  **ARGUMENT ON LIABILITY**

Andrews v. City of Philadelphia, 895 F.2d 1469 (C.A.3, Pa., 1990) sets

forth the criteria under which these Defendants are liable.  If supervisors either

directly participated or had actual knowledge of a hostile environment, and

acquiesced through inaction, they can be found liable.  Respondeat superior

liability exists where the defendant's management level employees knew or

should have known of harassment and failed to investigate and take prompt

remedial action.

The management personnel for each of the instant Defendants, in addition

to being told about the graffiti, were also personally aware of it.  Some have

admitted to seeing the racial graffiti.  Others admitted they saw graffiti, but never

read it.  Kennedy, Bogan's Project Manager and the highest ranking Bogan

employee on site, admitted to seeing his name on the wall in one inch letters, but

never bothered to read the rest of the writing.  Some of the racial graffiti was as

big as his head.

It is obvious from the attached photographs that the racial graffiti was so

pervasive and so outrageous, that it would be incomprehensible for any party

who was in those bathrooms to deny their awareness of it.  The words and

drawings were in clear view.  These management employees never did anything

to investigate the incidents of racial harassment and, other than having the

bathrooms cleaned, never did anything to remedy the harassment.  By failing to

investigate the source of the problem, they implicitly encouraged workmen to continue in their abuse of their African American counterparts.  This evidence is both sufficient to prove direct discrimination and supports a finding that they acquiesced to it.

Michael DelCasale was the go-to man, the man in charge, the man who ran the show.  He took measures to rid his worksite of those employees he found in violation of work contracts, but did nothing to rid the worksite of those individuals who continually violated the antidiscrimination portions of the contract. He also acquiesced in racial graffiti and slurs that were so offensive and so regular that they could not have gone unnoticed.  Most deponents from the defense admitted that every construction site is filled with racial graffiti.  This egregious custom and policy continues in this industry, because no one has taken any action to put an end to it, including all the parties involved herein.

Plaintiffs who claim that they have been racially harassed have a cause of action under Title VII if the harassment was either a quid pro quo arrangement, or if the harassment was so pervasive that it had the effect of creating an intimidating, hostile or offensive work environment.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399 (U.S.Dist.Col., 1986)

There is no doubt that seeing a comment as intimidating as "Who let that dirty nigger J.T. into Local 36" or "kill niggers" would affect every black worker. James T. Slater testified that he feared for his life.  He was afraid that someone

would cut his lanyard while he was thirty feet in the air, or would purposely drop something on his head while he was walking below.  (Slater N/T 140-143, Ex. "P")  Riddick believed that he was purposely set up to be electrocuted.  (Riddick N/T 277-282, Ex. "R")  The other Plaintiffs feared their families or themselves would be harmed by the individuals who hated them so much because of the color of their skin.  Statements like "MLK day kill 4 more so we can have a week off" are sufficient to put any reasonable black man in fear of his life.

The totality of the circumstances and the existence of this hostile and abusive working environment were severe enough to affect the psychological stability of these minority employees.  Therefore, it is sufficiently established that there existed a hostile working environment.  Under Vance v. Southern Bell Tel. and Tel. Co., 863 F2d 1503, 1510 (C.A.11., (Fla.), 1989) the Court held the following five constituents must converge:

> 1.  The employees suffered intentional discrimination because of their race.

The writings on the walls of the bathrooms were no accident.  They were placed there with racial animus.  All individuals who were aware of that graffiti and did nothing to stop it acquiesced in that harassment.

> 2.  The discrimination was pervasive and regular.

Kennedy admitted that as fast as the writing was taken off, it returned.  The pictures make it clear that this racial harassment covered the portapotties from wall to wall and ceiling to floor.

> 3.  The discrimination detrimentally affected the plaintiffs.

Each of these Plaintiffs was so badly affected that they could not continue with their employment.  Riddick and Slater left the worksites and quit their respective unions because they could no longer tolerate the hostility.  Both had to seek long term psychological care.  (Riddick N/T 139-140, Ex. "R") (Slater N/T 178-179, Ex. "P").  Grimes would go home at night and fight with is wife.  He suffered anxiety and knots in his stomach. (Grimes N/T 165, Ex. "O"). Campbell lost all courage and confidence to deal with the situation.  (Campbell N/T 215, Ex. "Q")

*4.  The discrimination would detrimentally affect a reasonable person of the same race in that position.*

There is no doubt that any black man would be offended by this obvious hatred.  Defendants admit that the writings in the photographs would be offensive to all African American workers.

Pervasive use of derogatory and insulting terms relating to race serve as evidence of a hostile environment.  Katz v. Doyle, 709 F.2d 251, 254 (C.A.Va., 1983)  There is no doubt that the racially derogatory and insulting graffiti on the bathroom walls that continued until the end of this construction created a hostile environment.

*5.  The existence of respondeat superior liability.*

Each of these supervisors and management personnel knew or should have known of this discrimination.  These management-level employees had actual or constructive knowledge of the existence of this hostile environment and not only failed to take prompt and adequate remedial action, not one of them did anything that would cause this discrimination to end.  Under Katz v. Dole, supra, they are liable.  Nothing was done to remove these barriers to employment that operated invidiously to discriminate on the basis of race.  Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849 (U.S.N.D., 1971)

Harris v. Forklift Systems, Inc. 510 U.S. 17, 114 S.Ct. 367, 371 (U.S.,

1993) stated that Title VII is violated by a work environment abusive to

employees because of their race.  If an employer knowingly (actually or

constructively) permits a hostile work environment to exist, it is of no import that

the collection of incidents comprising the claim were committed by a variety of individuals.  Rather, by implicitly condoning harassing behavior, the employer may facilitate its spread by a great number of harassing employees.  West v. PECO, 45 F.3d 744 (C.A. 3 (Pa.) 1995)  A hostile work environment is like a disease.  It can have many symptoms, some of which change over time, but all of which stem from the same root.  The etiology is pure bias.  West, supra.


## IX. DEFENDANTS' ABILITY TO RAISE AN AFFIRMATIVE DEFENSE

Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283, (U.S.Fla., 1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2270, (U.S.Ill., 1998) provide an employer an affirmative defense to a Title VII claim premised on vicarious liability when there has been no tangible employment action taken against the employee.  All employees herein have suffered tangible employment action.

Keith Riddick and James Slater testified that they asked to be laid off because they could no longer tolerate the hostile environment and therefore, were constructively discharged.   See Goss v. Exxon Office Systems Co., 747 F.2d 885 (C.A.Pa., 1984) (Riddick N/T, Ex. "R"; Slater N/T 178-179, Ex. "P").  Roy Grimes was laid off before the work was completed, while white workers were still working on the site (Grimes N/T, Ex. "O")  Jeffrey Campbell was the only employee who was not transferred to phase two of the project, even though

white workers with less seniority and experience were transferred.  (Campbell N/T, Ex. "Q")

However, it is not necessary to even reach the issue of tangible employment action, because the employers failed to exercise any action to prevent or correct the harassing behavior that these employers knew existed. They have no defense.

Arguendo, for these Defendants to succeed on the defense, the employer must establish by a preponderance of the evidence two elements:  "(a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Durham Life Ins. Co. v. Evans, 166 F.3d 139 (C.A.3 (Pa.) 1999)

In  Kolstad v. American Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118, (U.S., 1999) the Supreme Court held an employer is vicarious liable for the acts of a managerial employee, and open to punitive damages if the employer failed to show a good-faith effort to comply with Title VII.  To meet the good-faith compliance standard, the employer must at least adopt antidiscrimination policies and make a good faith effort to educate its employees about these policies and the statutory prohibition.  Kolstad at 545-546.  The undisputed evidence must demonstrate both that the employer maintains a strong policy against

67

harassment and that it adequately trained its employees to comply with that policy and Title VII.  None of these defendants educated or trained their management level employees and therefore there is no good faith defense.

A written statement, without more, is insufficient to insulate an employer from punitive damages liability.  E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1248 (C.A.10 (N.M.), 1999); Cadena v. Pacesetter Corp., 224 F.3d 1203 (C.A.10 (Kan.), 2000)

A defendant must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate.  "Although the purpose of Title VII is served by rewarding employers who adopt anti-discrimination policies, it would be undermined if those policies were not implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees."  Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493, 516 (C.A.9 (Wash.), 2000)  It is when looking at the employer's reasonable preventative measures that the existence of an anti-harassment policy has an impact.   Shaw v. AutoZone, Inc., 180 F.3d 806, 810 (C.A.7 (Ill.), 1999)  Such a policy will not satisfy this affirmative defense if it has not been disseminated to the employees.  See Faragher, supra. at 2293.

Because Defendants in the instant cannot show that they had any anti-harassment training in place, the Court must conclude that they have not satisfied their burden of establishing that it took reasonable steps to prevent harassment. E.E.O.C. v. Wal-mart, supra.

Since proof of *both* prongs is necessary to establish the affirmative defense, failure to establish either proof alone would prevent the Defendants from prevailing on this defense. Therefore, these Defendants have no protection from vicarious punitive liability for the conduct of their managerial agents. See Shaw, supra. at 813. Defendants in the instant case cannot establish either of those criteria. They took no action to promptly correct the harassment, and each management level person and supervisor testified that they knew of the racial harassment. Bogan employees Kennedy, Hartman, Anewalt, Kane and David all admitted to knowledge of the harassment. Wood, Mann, and Thomas of Steel Suppliers admitted their knowledge of the harassment. The knowledge of IBEW personnel Newhard, Haines and Reichert was established, as was the knowledge of Ironworkers Union Local 36 President Frankenfield. Kilpatrick, Business Agent of Local 36 acknowledged his responsibility and failure to assure equal treatment of all his members. A union official with the knowledge of racial harassment who refuses to file a grievance for black workers is in violation of Title VII. Goodman v. Lukens Steel Co., 482 U.S. 656, 107 S.Ct. 2617 (U.S.Pa. 1987)

## X. DEFENDANTS ARE LIABLE FOR THEIR OWN NEGLIGENCE AND RECKLESSNESS

Under Restatement of Agency (Second), Chapter 7, §(2)(b), employers are liable for their own negligence or recklessness.  The Supreme Court reaffirms a negligence standard if a co-employee harasses another employee.  See Faragher and Ellerth, supra.  In this context, an employer is liable for "negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment."  Glickstein v. Neshaminy School District, et al., 1999 WL 58578 (E.D.Pa., 1999)

Under  Restatement of Agency (Second), Chapter 7, §(2)(b) an employer is liable when the employer is negligent with respect to harassment if it knew or should have known about the conduct and failed to stop it.  Bouton v. BMW of North America, Inc., 29 F.3d 103, 107 (C.A.3 (N.J.), 1994)  When harassment involves co-workers, the liability adheres to the employer not by agency rules, but by the employer's failure to take prompt and effective measures to remedy harassing behavior that it either knew, or in the exercise of due care, should have known was taking place.  Employers may not adopt a "see no evil, hear no evil" strategy, effectively condoning or ratifying an abusive atmosphere.  Ellerth, supra.  Every employer involved herein essentially covered there eyes and ears to the horrendously hostile atmosphere and the black man's cries for help.

In the instant case, the testimony of each and every management level personnel stated that they took no action.  Kennedy of Bogan and Newhard of Local 375 attempt to state that they told Hartman and other foremen to inform their men that the behavior would not be tolerated.  However, Hartman, Anewalt, Kane, Rompilla and David all deny that anyone told them that the behavior would not be tolerated, and none of them testified that they told their men of that fact. No other Defendant took any action whatsoever.

The action taken by the employer was to have been remedial in nature and sufficient to prevent the harassment from re-occurring in the future.  <u>Glickstein</u>, supra.   Obviously, their action, or lack thereof, did not prevent the harassment from re-curring since management has testified that the racial graffiti continued until the day the project closed.


## XI. <u>CONCLUSION</u>

These Plaintiffs have been damaged for life because of the discrimination they suffered on this job site.  They felt defeated by the lack of response to their complaints.

Jeffrey Campbell is a 6'5", 325 lb. father of five.   He is gentle and apt not to complain about mistreatment by his peers.  (Dr. Boo N/T 54)  But he was so defeated by his inability to eradicate the racial hatred on this worksite, that he stated "I was not brave.  I didn't have courage, because if I was brave and if I had

courage and I thought that this would change I would have done a lot more."
(Campbell N/T 215, Ex. "Q").

James Slater testified from his heart:

"I'm listening. I'm looking at it. I'm seeing it, I'm seeing swastikas, I'm seeing stickers on hard hats, on T-shirts. I'm seeing tattoos. I'm seeing things that you shouldn't see in this country that's supposed to be free. Not only that, in a worksite that's supposed to be union, that's supposed to be equal opportunity free. You are not supposed to go to work to be a harassed by your color. You are not supposed to go to work and have to be degraded because of your race, because you're black, African-American. You shouldn't go to work having to worry about that. You should go to work worrying about what am I going to do today at work, what job do they have for me today, how can I best serve this company; but you can't because you have to go there worrying about who's going to knife my harness when I have to climb up on the steel. Who is going to do something to what ties me off, am I going to fall. Is something going to drop on me while I'm walking down below because they don't like me because of my skin color. This isn't something that I like, this isn't something you can make up, this is something that happens and this is something that goes on still to this day and it's hard. Unless you can go through it."

"I don't want to be an example of someone you have to read about in the paper saying we can't find him or somebody shot him or drug him with chains or beat him or just hung him. No, I don't want to be an example. I don't think no one else should."

"No, I think we live in a country that we don't like terrorism, but terrorism still happens in this country and this is a form of terrorism any way you look at it." (Slater N/T 417, 418, Ex. "P")

Because all these defendants were aware of this insidious racial harassment, and because not one of them took any action whatsoever to stop it, it is respectfully requested that Summary Judgment be granted as to liability against all Defendants.

Respectfully submitted,

**HILL WALLACK LLP**


BY:___*Joanne Rathgeber, Esquire, JR5983*___
    **JOANNE RATHGEBER, ESQUIRE**
    Attorney for Plaintiffs/Interveners
       Keith Riddick
       James Slater
       Roy Grimes
       Jeffrey Campbell


Dated:_ September 22, 2006

## TABLE OF EXHIBITS

Exhibit "A"    -    EEOC Picture Exhibits 1066 through 1100

Exhibit "B"    -    Notes of Testimony of Charles Wood

Exhibit "C"    -    Notes of Testimony of Joseph Kane

Exhibit "D"    -    Notes of Testimony of Anthony David

Exhibit "E"    -    Notes of Testimony of Charles Mann

Exhibit "F"    -    Notes of Testimony of Joseph Kennedy

Exhibit "G"    -    Notes of Testimony of William Newhard

Exhibit "H"    -    Notes of Testimony of William Thomas

Exhibit "I"    -    Notes of Testimony Robert Kilpatrick

Exhibit "J"    -    Notes of Testimony Ruben Soto

Exhibit "K"    -    Notes of Testimony of Robert Keyser

Exhibit "L"    -    Notes of Testimony of Terry Hartman

Exhibit "M"    -    Notes of Testimony Richard Anewalt

Exhibit "N"    -    Notes of Testimony David Rompilla

Exhibit "O"    -    Notes of Testimony of Roy Grimes

Exhibit "P"    -    Notes of Testimony of James Slater

Exhibit "Q"    -    Notes of Testimony of Jeffrey Campbell

Exhibit "R"    -    Notes of Testimony of Keith Riddick

Exhibit "S"    -    Notes of Testimony of Frankenfield

## TABLE OF EXHIBITS con't.

Exhibit "T"    -         Notes of Testimony Neil Gerwig

Exhibit "U"    -         Notes of Testimony Michael DelCasale

Exhibit "V"    -         IBEW's Constitution

Exhibit "W"    -         Ironworker's Constitution

Exhibit "X"    -         Project Labor Agreement

Exhibit "Y"    -         Terms and Conditions

Exhibit "Z"    -         Collective Bargaining Agreement

**HILL WALLACK**
BY:   **JOANNE RATHGEBER, ESQUIRE**
Attorney I.D. No. 30391
111 East Court Street
Doylestown, PA 18901
215-340-0400                                                         Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et. al. | : | CIVIL ACTION |
| Plaintiff, | : | No.  05-03389 |
| | : | (CONSOLIDATED) |
| v. | : | |
| | : | |
| CONECTIV; A.C. DELLOVADE, INC.; STEEL SUPPLIERS ERECTORS, INC.; MATRIX SERVICES INDUSTRIAL CONTRACTORS (d/b/a BOGAN, INC./HAKE GROUP); IBEW LOCAL 375; IRONWORKERS LOCAL 36 Defendants. | : : : : : : | |

## CERTIFICATION OF SERVICE

I, **JOANNE RATHGEBER, ESQUIRE**, hereby certify that a true and correct copy

of Riddick's Answers to Bogan, Inc./Hake Group's Interrogatories were served by

Electronic mail on the 22nd day of September, 2006, to the following:

David Newmann, Esquire
Hogan & Hartson, LLP
1835 Market Street, 28th Floor
Philadelphia, PA 19103
Counsel for Conectiv

Harry T. Jones, Jr., Esquire
Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Counsel for Conectiv

Irwin Aronson, Esquire
Willig, Williams & Davidson
Suite 400, 212 Locust Street
Harrisburg, PA 17101
Counsel for IBEW Local 375

Hannah Schwarzschild, Esquire
Willig, Williams & Davidson
24th Floor, 1845 Walnut Street
Philadelphia, PA 19103
Counsel for IBEW Local 375

Wayne Stanfield, Esquire
Reed Smith, LLP

G. Kevin Fasic, Esquire
Tighe, Cottrell & Logan, P.A.

2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
Counsel for Bogan/Hake

704 North King Street, Suite 500
P.O. Box 1031
Wilmington, DE 19899
Counsel for Steel Suppliers, Inc.

Quintes D. Taglioli, Esquire
Markowitz & Richman
Suite 200 Commonwealth Building
512 Hamilton Street
Allentown, PA 18101-1505
Counsel for Ironworkers Local 36

Joseph P. Milcoff, Esquire
Reed Smith, LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1186
Counsel for AC Dellovade, Inc.

Terrence Cook, Esquire
Equal Employment Opportunity Commission
The Bourse Building, Suite 400
21 South Fifth Street
Philadelphia, PA 19106-2515

BY: _Joanne Rathgeber, Esquire, JR5983_____
   **JOANNE RATHGEBER, ESQUIRE**
   Attorney for Plaintiffs

Dated: September 22, 2006