**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | : | NO. 2:05CV03389-GP |
| OPPORTUNITY COMMISSION, | : | (CONSOLIDATED) |
| *et al.,* | : | |
| | : | |
| Plaintiffs | : | THE HON. THOMAS M. GOLDEN |
| vs. | : | |
| | : | |
| CONECTIV, *et al.,* | : | |
| | : | |
| Defendants | : | |

## DEFENDANT IRONWORKERS LOCAL 36 MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56

AND NOW, comes the Defendant, Ironworkers Local Union No. 36, by and through its attorneys, Quintes D. Taglioli, Esquire, of MARKOWITZ & RICHMAN, and hereby files this Motion for Summary Judgment pursuant to F.R.C.P. 56 and in support thereof respectfully represents:

1.      On July 1, 2005, the Plaintiff, James Slater (Plaintiff/Slater) filed a Complaint against the Defendant, International Association of Bridge, Structural, and Ornamental Ironworkers, AFL-CIO,  Local Union #36 (Union), and two other Defendants, Conectiv and Steel Suppliers, Inc.

2.      In his Complaint, the Plaintiff alleged, *inter alia,* that while the Plaintiff was working for Steel Suppliers at a construction site in Bethlehem, Pennsylvania controlled by Conectiv, the Plaintiff was subject to racial discrimination.  The Plaintiff further alleged that during his employment he was a member of the Union.

3.      As to the Union, Plaintiff alleges that as a consequence of actions which occurred while he was employed by Steel Suppliers at the Conectiv site, and because of its operation of the hiring hall and referral system, the Union discriminated against him

because of his race in violation of Title VII of the *Civil Rights Act of 1964*, 42 U.S.C. §

2000(e) *et seq.*, (Count II of the Comp.).

    4.     Plaintiff also alleged that as a consequence of an oral contract of

employment the Plaintiff entered into with the Union, the Union violated the *Civil Rights*

*Act of 1866, as amended,* 42 U.S.C. § 1981 (Count IV of the Comp.).

    5.     Plaintiff also alleged that as a result of the actions identified in the

Complaint which supported those statutory violations, the Union committed the tort of

intentional infliction of emotional distress (Count VI of the Comp.).

    6.     On the same date, the Equal Employment Opportunity Commission

(EEOC) filed a Complaint against Conectiv, Steel Suppliers, AC Dellovade Inc., Matrix

Services Industrial Contractors d/b/a Bogan Inc./Hake Group.  In its Complaint, the

EEOC alleged that those Defendants violated § 703(a)(1) of Title VII by subjecting

certain individuals, including the Plaintiff, to a racially hostile work environment.  The

hostile work environment included racial graffiti on portable toilet walls, racially

offensive comments, a hangman's noose, and other racially derogatory remarks on the

job site.  (EEOC Compl., ¶11.)  Individually named as affected employees in the EEOC

Complaints were Keith Riddick (Riddick), James Slater (Slater), Roy Grimes (Grimes),

and Jeffrey Campbell (Campbell).  The EEOC did not name the Union as a Defendant.

    7.     The other individually named Plaintiffs in the EEOC Complaint, like

Slater, filed civil actions against Conectiv and their respective employers.  Further, in the

case of Plaintiff Riddick, Riddick not only named Conectiv and his employer but also his

Union, International Brotherhood of Electrical Workers Local 375.

    8.     All Defendants filed timely answers denying liability for any actions

alleged in the Complaint.

9.      On October 12, 2005, Judge Gene E.K. Pratter consolidated the EEOC action with the individual actions for purposes of discovery and pretrial disposition.

10.     Discovery has been completed and there are no genuine issues of material fact.

11.     Those counts of the Complaint wherein the Plaintiff alleges liability on behalf of the Local 36 should be dismissed as a matter of law, as the Union has not violated Title VII, § 1981, or committed the tort of intentional infliction of emotional distress for the reasons cited in the accompanying Brief.

WHEREFORE, the Defendant, Ironworkers Local 36, prays that this Motion for Summary Judgment be granted, and this Honorable Court dismiss the Plaintiffs' Complaint as to Local 36, enter judgment in favor of Local 36 against the Plaintiff, with costs against the Plaintiff.

Respectfully submitted,

**MARKOWITZ & RICHMAN**

Date:   11/9/06                    By:/S/  QUINTES D. TAGLIOLI, ESQ.
                                       QUINTES D. TAGLIOLI, ESQUIRE
                                       I.D. # 30158
                                       512 Hamilton Street, Suite 200
                                       Allentown, PA  18101-1505
                                       (610) 820-9531

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EQUAL EMPLOYMENT | : NO. 2:05CV03389-GP |
| OPPORTUNITY COMMISSION, | : (CONSOLIDATED) |
| *et al.,* | : |
| | : |
| Plaintiff | : HONORABLE THOMAS M. GOLDEN |
| vs. | : |
| | : CIVIL ACTION |
| CONECTIV, *et al.,* | : |
| | : |
| Defendant | : |

**DEFENDANT IRONWORKERS LOCAL 36'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

On July 1, 2005, Plaintiff James Slater (Plaintiff/Slater) filed a Complaint against Defendant Conectiv, Defendant Steel Suppliers, Inc., and Defendant Ironworkers Local No. 36 (Union/Local 36).  In his Complaint, Plaintiff alleged that he became a member of the Union in 1999 as an apprentice.  (Plaintiff's Comp., ¶10.)  In or around June 2002, he commenced employment for Steel Suppliers at the Conectiv site in Bethlehem, Pennsylvania.  (Plaintiff's Comp., ¶3.)  He alleged for the period from August 2002 until March 2003 he was subject to racial harassment in the nature of racial graffiti on bathroom walls, racial jokes, and derogatory racial statements.  (Plaintiff's Comp., ¶¶14-41.)  Slater therefore claimed Local 36 violated Title VII, 42 U.S.C. §2000(e) as did the other two Defendants by separate counts.  Slater also alleged Local 36 discriminated on the basis of race in the operation of its hiring hall/referral system in violation of Title VII, that Local 36 and he entered into an oral employment contract

1

which gave rise to a cause of action pursuant to 42 U.S.C. § 1981, and that Local 36 had committed the tort of intentional infliction of emotional distress.

On the same date, the Equal Employment Opportunity Commission (EEOC) filed a Complaint against Conectiv, Steel Suppliers, AC Dellovade Inc., Matrix Services Industrial Contractors d/b/a Bogan Inc./Hake Group.  In its Complaint, the EEOC alleged that those Defendants violated § 703(a)(1) of Title VII by subjecting certain individuals, including the Plaintiff, to a racially hostile work environment.  The hostile work environment included racial graffiti on portable toilet walls, racially offensive comments, a hangman's noose, and other racially derogatory remarks on the Conectiv job site. (EEOC Comp., ¶11.)  Individually named as affected employees in the EEOC Complaints were Keith Riddick (Riddick), Slater, Roy Grimes (Grimes), and Jeffrey Campbell (Campbell).  The EEOC did not name the Union as a Defendant.

The other individually named Plaintiffs in the EEOC Complaint, like Slater, filed civil actions against Conectiv and their respective employers.  Further, in the case of Plaintiff Riddick, Riddick not only named Conectiv and his employer but also his Union, International Brotherhood of Electrical Workers Local 375.  On October 12, 2005, Judge Gene E.K. Pratter consolidated the EEOC action with the individual actions for purposes of discovery and pretrial disposition.

Extensive discovery thereafter ensued.  For purposes of this Motion, the following depositions were taken by the parties:  Plaintiff, Robert Kilpatrick (Kilpatrick) (Exh. G), Business Representative for the Union, Anthony David (David) (Exh. E), a member of the Union and a steward at the Conectiv site while the Plaintiff was employed by Steel Suppliers, Richard Frankenfield (Frankenfield) (Exh. B), President of the Union and a

member of Local 36, Charles Mann (Mann) (Exh. A), member of the Union and steward

at the Conectiv site for the period of time prior to David's acting as steward Scott

Tornetta, member of the Union and Apprentice Coordinator for the Joint Apprenticeship

Training Committee of Ironworkers Local 36 (Committee), and Ruben Soto (Soto) (Exh.

D).  The parties have also exchanged Interrogatories and Answers and Requests for

Production of Documents.  Various documents were produced including but not limited

to:  the Collective Bargaining Agreement (CBA) (Exh. I, CBA) between Steel Suppliers

and the Union, the Union's out-of-work/referral list (Exh. J), the Constitution of the

International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers

(Constitution) (Exh. H), the Bylaws of Ironworkers Local 36 (Bylaws) (Exh. K),

Ironworkers Local 36 logbook (Logbook), and the National Apprenticeship Training

Standards (Standards) (Exh. L).

On September 22, 2006, Slater filed a Motion for Summary Judgment against all

Defendants.  In that Motion, Plaintiff only addressed the issues raised in his Complaint as

they relate to the racial harassment allegations at the Conectiv work site under Title VII.

Plaintiff made no mention of the Title VII allegations against Local 36 concerning its

hiring hall/referral system, nor his § 1981 claim against Ironworkers Local 36.[1]

Based upon the pleadings, depositions, Answers to Interrogatories and admissions

on file and Affidavits, there are no genuine issues as to any material fact relating to the

liability of Local 36 as to any of the conduct alleged by Slater at the Conectiv site or

otherwise as set forth in his Complaint.  Therefore, the Union is entitled to judgment as a

matter of law.

---

[1] Since Ironworkers 36 has filed this Motion for Summary Judgment and a Brief in Opposition to Plaintiff's
Motion for Summary Judgment, many of the facts and issues are the same.

## II.    FACTS

Ironworkers Local 36 is an unincorporated association consisting of approximately 160 to 170 members.  (Exh. G, Kilpatrick Affidavit, ¶10.)  Its purpose is to represent its members for the purposes of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, and conditions of work.  (Exh. G, Kilpatrick Affidavit, ¶10.)  As such, it is a labor organization as defined by the National Labor Relations Act (Act), by Section 2(5) of the Act, 29 U.S.C. § 152(5).  As a Local Union, it maintains its own structure in accordance with its bylaws and maintains an affiliation with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers.  Consequently, it is subject to the Constitution of the International.  It has a president, vice-president, business manager, treasurer, financial secretary, recording secretary, executive committee, and trustees.  All officers are elected as required by the Constitution and Bylaws and applicable law.  Local 36, by its Business Manager, appoints a steward on each job in accordance with the general working rules of the International.  The steward's function is to complete and file steward reports with the Local Union concerning reporting hours worked by members who work on job sites.  They are also responsible for resolving grievances that may arise under the terms of the CBA between the various employers, which are signatories to CBA's with the Local Union.  In the event they are unable to resolve those disputes to their satisfaction, they are responsible for submitting or notifying the business manager of the grievance.  (Exh. G, Kilpatrick Affidavit, ¶7; Exh. G, Kilpatrick Affidavit, ¶¶8, 34; Exh. B, Dep. of Frankenfield, pp. 32, 43, 49-51; Exh. C, Dep. of Slater, pp. 220-239; and Exh. E, Dep. of David, pp. 36, 73, 95).

4

The business manager's responsibilities are to act as the representative for the members while they are working for the employers. He is in charge of the daily operations of the Local Union and has supervision over any salaried employees of Local 36. He has final say over all jurisdictional and internal matters. He is the Chief Executive Officer of the Local Union. (Exh. G, Kilpatrick Affidavit, ¶¶4, 7; Exh. H, International Constitution, pp. 98-99.)

The president of the Union is responsible for presiding over regular and special meetings. He is responsible to appoint all committees. He has no responsibilities concerning the collective bargaining relationship with the employers, as to their implementation or regulation. He has no authority or power on the job site to act as the steward or business agent in terms of accepting, resolving, or presenting grievances or complaints. (Exh. G, Kilpatrick Affidavit, ¶26; Exh. B, Dep. of Frankenfield, pp. 33, 46; Exh. H, International Constitution, p. 96.; Exh. F, Dep. of Kilpatrick, p. 46.)

Usually every three (3) years, the Local Union negotiates and executes a CBA between it and the area ironworker employers. The geographical jurisdictional areas that Ironworkers Local 36 covers the counties of Northampton, parts of Bucks, Lehigh, Carbon, Monroe and Pike in Pennsylvania and Warren and northern half of Hunterdon County in New Jersey. That agreement provides for payment of wage rates and contributions to various fringe benefit funds, including the Health and Welfare Fund, Pension Fund, an Annuity Fund, an Apprenticeship Training Fund, and various other national funds. (Exh. G, Kilpatrick Affidavit, ¶¶10-12.) It regulates hours of work, breaks, and other conditions of employment. Any employer who signs the CBA is subject to its terms and conditions. As such, when a particular construction project

commences, an employer either has already is a signatory to the CBA or becomes one.  In that event, its employees are entitled to the terms and benefits set forth in the CBA.  (Exh. G, Kilpatrick Affidavit., ¶13.)

Employers hire employees through either as direct hires or through the Local 36's hiring hall.  A direct hire means the employer directly contacts an employee and assigns them work on a construction site.  Alternatively, if the employer does not have sufficient employees, it contacts the Union hall and requests that Local 36 refer members to the employer for work.  The employer is free to request particular employees through the Union hall in which case the Business Manager contacts the requested employee and that the employer has requested him for that construction site.  Absent requests for particular employees, the Union maintains an out-of-work list and a referral list.  The out-of-work list is a daily log sheet which the Business Manager maintains, showing the dates employees were referred to work and to which employers.  It also shows employees who were last referred to work and the amount of time that they worked at various job sites.  The referral list is a list maintained at the Union office.  Any member who is not employed and who appears at the Local 36 Union hall is required to sign the referral list.  The referral list shows the last date the member worked.  The Business then Manager refers to the requesting employer's members who are out of work, using both the logbook and the referral list.  The Business Manager refers out-of-work ironworkers to the employer based upon the principle that the employee who last worked should be the first assigned out of the Union hall, assuming they are qualified to perform the work.  If there are an insufficient number of workers at the Local 36 Union hall who have signed the

6

referral sheet, then the Business Manager will iron workers who are out of work based upon his log book.  (Exh. G, Kilpatrick Affidavit, ¶¶ 16-17.)

Members of Local 36 are divided into journeyman Ironworkers and apprentices. Journeyman Ironworkers are fully skilled Ironworkers who have completed the four year apprenticeship program established by the Local 36 Joint Apprenticeship Committee. The Committee is composed of at least three (3) members representing employers, and three (3) members representing Local 36.  The Union members who serve on the Committee are selected to serve by the President of Local 36.  Two of the members are appointed as individual union members and the third is appointed as a consequence of his position as the Business Manager.  The Committee selects the chairperson.  Funding for the Committee comes from contributions by the employer in accordance with the CBA. As such, the Committee is what is commonly known as a Taft-Hartley Apprenticeship Fund formulated in accordance with Section 302 of the National Labor Relations Act, 29 U.S.C. § 186(c)(6) and in accordance with Section 501(c) of the Internal Revenue Code. The Committee's functions include the acceptance of applicants into the apprenticeship program for those who wish to become journeyman Ironworkers.  The decision whether to accept an applicant as an apprentice is made by the Committee.  Depending upon their length of time within the apprenticeship program, apprentices receive a percentage of the journeyman base rate.  That percentage ranges from 50% to 100%.  Further, the Committee has the discretion to recommend that a journeyman receive a percentage higher than the graduated scale in the event he has sufficient experience or training prior to becoming an apprentice, which would place him at a skill level commensurate with an

7

amount of time worked greater than that actually worked.  (Exh. G, Kilpatrick Affidavit, ¶¶19-20; Exh. F, Dep. of Kilpatrick, pp. 10, 16.)

Slater applied to the Committee to be accepted as an apprentice Ironworker in 2001.  Slater's application as an apprentice was accepted.  Likewise, as a consequence of his acceptance into the apprenticeship program, he applied for apprenticeship membership with the Union.  That application was also accepted in 2001.  Pursuant to the hiring hall system, Kilpatrick was responsible for referring members to signatory employers who needed labor.  Slater immediately began working, commencing August 2001 at various job sites.  (Exh. G, Kilpatrick Affidavit, ¶24.)  He eventually was referred to the Conectiv site and worked for Hake, Inc., Southern Steel, and Chicago Bridge and Iron up to the summer of 2002.  (Exh. C, Dep. of Slater, p. 213.)  Eventually, on July 26, 2002 Kilpatrick again referred him for work by Steel Suppliers at the Conectiv site. Slater worked at that site as an apprentice Ironworker for Steel Suppliers continuously from July 26, 2002 until March 28, 2003.

On March 28, 2003 Steel Suppliers laid him off, together with most of the other Ironworkers since the job responsibilities for Steel Suppliers at the Conectiv site had ceased.  (Exh. E, Dep. of David, p. 104.)  Slater alleges that he requested to be laid off. Kilpatrick recalls Slater appearing at the Union hall, requesting his name not be included on the out-of-work list since he had personal business to take care of in Tennessee.  (Exh. G, Kilpatrick Affidavit, p. ¶.)

When Slater was still employed by Steel Suppliers commencing in July 2002, the job steward at the site was Billy Dinder.  Dinder was eventually replaced in or about

8

November 2002 by David, who acted as the steward through Slater's employment by Steel Suppliers at Conectiv. (Exh. E, Dep. of David, p. 29.) Slater alleges that shortly after he commenced employment, he noticed racially offensive graffiti in the portable toilets throughout the Conectiv site. Some of the racially offensive comments were directed to him, others were generally racially offensive. Still others were obscene and derogatory to other members of Local 36, as well as other employees on the job site. (Exh. E, Dep. of David, p. 38.)

Employees who worked for Steel Suppliers were provided with a trailer for lunches and breaks. Slater alleges that during lunches, racially offensive jokes were told by employees of Steel Suppliers. In particular, he referred to a statement that a Marlboro cigarette pack looked like a Ku Klux Klan insignia.

During Slater's entire period of employment with Steel Suppliers at the Conectiv site from July 2002 to March 2003, Slater alleges he was subject to this racial harassment. He acknowledges, however, that at no time did he complain about the racial harassment to David as the steward. (Exh. C, Dep. of Slater, pp. 239-240.) He alleges that David did overhear racially derogatory jokes in the trailer. (Exh. C, Dep. of Slater, p. 239.) Slater also acknowledges that he never asked the steward or Kilpatrick to file a grievance concerning the racial harassment under the terms of the CBA. (Exh. C, Dep. of Slater, p. 240.) Both Kilpatrick and David agree that Slater never requested that either of them file a complaint or grievance alleging racial harassment at the Conectiv work site under the terms of the conditions of the CBA or otherwise. (Exh. G, Kilpatrick Affidavit, ¶22 and Exh. E, Dep. of David, pp. 37, 57, 63, 67, 73, and 97.)

9

Slater eventually returned from Tennessee and first signed up as available for work on the out-of-work referral list on July 17, 2005.  He appeared at the Union hall 12 times between July 17 and October 21.  On three (3) of those occasions he reported at a time earlier than 9:35 a.m.  All other occasions he reported at 9:35 a.m. or later in the day.  (Exh. G, Kilpatrick Affidavit, ¶23.)  During the summer of 2003 through and including the fall of 2003, work had slowed considerably in the jurisdiction of Local 36.  Consequently, there was a substantial number of out-of-work members of Local 36 who availed themselves of the referral list.  (Exh. G, Kilpatrick Affidavit, ¶23.)  Eventually, in October, Slater was referred to work at a job site in Bloomsbury, New Jersey, working on Interstate 78.  After that assignment, Slater never appeared at Local 36 again.  He never contacted Kilpatrick concerning work referrals.  He never signed the out-of-work list again.  (Exh. G, Kilpatrick Affidavit, ¶24.)  On November 25, 2003, he filed a Charge with the Equal Employment Opportunity Commission alleging racial discrimination pursuant to Title VII at the Conectiv job site by Conectiv, Steel Suppliers, and Local Union 36.  (Exh. M.)

During all relevant time periods, Local 36 had two (2) employees.  The first is the Business Manager, Robert Kilpatrick, and the other is a clerical secretary, Ann Heckenberger.  Local 36 pays a salary to Kilpatrick and a salary to Heckenberger and provides fringe benefits.  Its members, including Slater, paid monthly dues and working dues consistent with the CBA and the Constitution and Bylaws.  Local Union 36 never paid wages to Slater or a paycheck to Slater.  It never provided him with a W-2 or any other employment form.  It never provided him with health insurance or any other fringe benefit.  Wages and fringe benefits that Slater received were all paid by employers such

as Steel Suppliers in accordance with the terms and conditions of the CBA.  Slater was a member of Local 36 only.  (Exh. G, Kilpatrick Affidavit, ¶¶14-15.)  Once referred to a requesting employer, the method, process, and manner in which Slater performed his job duties was under the control and direction of the employer, such as Steel Suppliers. Local 36 did not direct or supervise his work.  (Exh. G, Kilpatrick Affidavit, ¶7.)

### III.   ISSUES

A.     WHETHER PLAINTIFF'S ALLEGATIONS CONCERNING
CONDUCT DESCRIBED IN PARAGRAPHS 23 AND 24 OF HIS
COMPLAINT FAILED TO SUPPORT HIS ALLEGATIONS OF RACIAL
HARASSMENT WHEN THE ALLEGATIONS ARE ONE YEAR PRIOR TO
THE CONDUCT OTHERWISE COMPLAINED ABOUT IN THE
COMPLAINT, THE ALLEGATIONS SURROUND CONDUCT WHICH
OCCURRED AT ANOTHER JOB SITE, THE ALLEGATIONS OCCURRED
WHILE PLAINTIFF WAS EMPLOYED WITH AN EMPLOYER OTHER
THAN STEEL SUPPLIERS, AND THE ALLEGATIONS ARE NOT
SUPPORTED BY THE ALLEGED EYEWITNESS?

B.     WHETHER THE PLAINTIFF'S COMPLAINT UNDER TITLE VII
ALLEGING RACIAL HARASSMENT AGAINST LOCAL 36 SHOULD BE
DISMISSED AS A MATTER OF LAW SINCE THERE IS NO EVIDENCE
THAT THE PLAINTIFF ASKED THE UNION TO TAKE ANY ACTION
WITHIN ITS REPRESENTATIVE CAPACITY, SUCH AS BY FILING A
GRIEVANCE UNDER THE TERMS OF THE CBA OR OTHERWISE?

C.     WHETHER THE LOCAL UNION 36 IS ENTITLED TO JUDGMENT
AS A MATTER OF LAW RELATING TO ALLEGATIONS OF VIOLATIONS
OF TITLE VII ON THE GROUNDS THAT IT DISCRIMINATED ON THE
BASIS OF RACE IN ITS MEMBERSHIP PRACTICES AND THE
OPERATION OF ITS REFERRAL SYSTEM/HIRING HALL WHEN THERE
HAS BEEN NO EVIDENCE PRESENTED BY THE PLAINTIFF TO
SUPPORT THE ALLEGATION OTHER THAN HIS LACK OF REFERRALS
AFTER HE STOPPED APPEARING AT THE UNION HALL FOR WORK?

D.     WHETHER PLAINTIFF'S COUNT ALLEGING A VIOLATION OF
SECTION 1981 FAILS AS A MATTER OF LAW WHEN IT ALLEGES A
CONTRACT OF EMPLOYMENT BETWEEN THE PLAINTIFF AND THE
UNION WHEN THE PLAINTIFF WAS NEVER AN EMPLOYEE OF THE
UNION?

E.     WHETHER PLAINTIFF'S COUNT AS TO INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS SHOULD FAIL AS A MATTER
OF LAW WHEN THERE ARE NO FACTS WHICH ESTABLISH ANY
INTENTIONAL ACTION BY ANY AGENT OF THE UNION TO INFLICT
EMOTIONAL DISTRESS?

## IV.   <u>ARGUMENT</u>

A.     THE ALLEGATIONS OF PARAGRAPHS 23 AND 24 OF THE
COMPLAINT CANNOT SUPPORT ANY VIOLATION OF TITLE VII SINCE
THOSE FACTS RELATED TO A DIFFERENT EMPLOYER AT A
DIFFERENT JOB SITE DURING A DIFFERENT YEAR AND WERE DENIED
BY THE PLAINTIFF'S EYEWITNESS.

As this is a Motion for Summary Judgment, the standard of review is well

established.  Under F.R.C.P. 56(c), "summary judgment is proper if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  *Celotex Corp. vs. Catrett,* 477

U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the court must construe the facts and

inferences in a light most favorable to the non-moving party.  *Pollock vs. American Tel.*

*& Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986).  The role of the court is not "to

weigh the evidence and determine the truth of the matter, but to determine whether there

is a general issue for trial."  *Anderson vs. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106

S.Ct. 2505, 91 L.Ed. 2d. 202 (1986).  A factual dispute is "material" if it might affect the

outcome of the case under governing law.  *Id.*  "There is no issue for trial unless there is

sufficient evidence favoring the non-moving party for a jury to return the verdict for that

party."  *Id.* at 249.

The Plaintiff's Complaint almost exclusively surrounds facts and circumstances

which occurred at the Conectiv site.  The Plaintiff's theory is that the racially offensive

activities which occurred at the Conectiv site result in liability to Conectiv, Steel

13

Suppliers, and the Local 36.  In support, Plaintiff's verified paragraphs 23 and 24 provide as follows:

> 23.   In or around December 2002 or January 2003, Richard Frankenfield, President of Local 36 and Timothy Hess, Plaintiff's foreman, got into an altercation because Mr. Hess wanted Plaintiff to work with him and Mr. Frankenfield wanted Plaintiff at another place.  Plaintiff stayed with Mr. Hess.  After the argument, there was a drawing of Plaintiff and Mr. Hess in the port-o-potty with Plaintiff saying "eyes' listen to you, Timmy."

> 24.   Charles Mann, journeyman, believes that Mr. Frankenfield put the picture in the port-o-potty.

(Pl. Compl., pp. 23-24.)

The uncontroverted evidence has revealed, however, that that allegation of facts is singularly inaccurate.

Slater, Mann, and Frankenfield all testified that the facts alleged in paragraphs 23 and 24 of the Complaint are inaccurate.  First, the facts alleged in those two paragraphs did not occur in December 2002 or January 2003, they occurred in December 2001 or January 2002.  Secondly, they did not occur at the Conectiv work site but instead occurred at a work site known as the Free Bridge, which is a bridge between Pennsylvania and New Jersey, connecting Easton, Pennsylvania and Phillipsburg, New Jersey.  Third, the employer on that site was not Steel Suppliers but IEW.  (Exh. C, Dep. of Slater, pp. 207-211 and Exh. A, Dep. of Mann, pp. 138-140.)  Fourth, Mann testified that he never did tell Slater that Frankenfield engaged in any activities which could be construed as racially offensive as alleged in paragraph 24 of his Complaint.  (Dep. of Mann, 03/31/06, pp. 143, l. 23-24, p. 144, l. 1-24, p. 145, l. 1-4.)  Each one of these reasons supports a dismissal of these allegations.

14

First, the fact that the events occurred in December 2001 and January 2002 make them untimely.  Title VII plaintiffs in Pennsylvania must file their administrative discrimination charge within 300 days of the challenged employment action.  Under Title VII, a plaintiff such as Slater who resides in Pennsylvania, which has an agency authorized to grant relief for federally prohibited employment discrimination (the Pennsylvania Human Relations Commission), must resort to the state remedy before they would be allowed access to federal judicial relief.  *See* 42 U.S.C. § 2000(e)(5)(c) (Title VII).  Such states are termed "deferral" states.  *Oscar Meyer and Company vs. Evans,* 441 U.S. 750, 754-58, 99 S.Ct. 2066, 60 L.Ed. 2d 609 (1979).  It is undisputed that Pennsylvania is a deferral state.  *See* 43 P.S.  §§ 955, 959; *Sharpe vs. Philadelphia Housing Authority,* 693 F.2d 24, 26 (3d Cir. 1982).  Title VII plaintiffs who file in deferral states must submit their administrative discrimination charges within 300 days of the challenged employment action.  *See* 42 U.S.C. § 2000(e)(5)(1).  *Colgan vs. Fisher Scientific Company,* 935 F.2d 1407, 1413-15 (3d Cir. 1991).  The conduct alleged in paragraphs 23 and 24 occurred at the latest on January 31, 2002.  Slater filed his Charge with the EEOC on November 25, 2003, clearly more than 300 days from these alleged discriminatory acts.

Further, even if Slater could allege some argument that this is a continuing violation, there is no evidence to support that since this was not at the Conectiv job site and the employer was not Steel Suppliers.  This was at a job site over the Delaware River and the employer was IEW.  This Complaint is grounded solely in the activities which occurred at the Conectiv site when Slater was an employee of Steel Suppliers from July

15

2002 to March 2003.  The incident, to the extent it occurred, is not even remotely

connected to the allegations of the Plaintiff's Complaint.

Further, the apparent reason for the allegation is to somehow allege that Local 36

is responsible for some racially derogatory comments by assigning responsibility of those

comments to Frankenfield.  (See Plaintiff's Compl., ¶23.)  Unfortunately for Slater, the

witness whom Slater alleges to have told him that Frankenfield committed the racially

offensive act by writing racial slurs on a toilet wall denied ever telling Slater that

occurred.  Mann's testimony is as follows:

> Q.      Let me ask you one last question.  In Paragraph 24 of the Complaint, would you just look at that again.

> A.      Yes, okay.

> Q.      Did you tell Mr. Slater that?

> A.      No, I did not.  I never said that to him.

> Q.      Do you have any idea or can you testify at all today as to where he would come up with that information?

> A.      He asked me who put that in there and I told him I didn't know and that's where that came – I don't know where he came up with that one, but I never gave him that answer to that.

> Q.      Just so we are clear for that the record, when you say "he asked me," you mean Mr. Slater?

> A.      Right.  Mr. Slater asked me if Rich Frankenfield was the one who wrote the picture in there.  I never said that that was the guy who wrote it.  How would I know that?

> Q.      That's why I was asking.  What did you tell Mr. Slater?

> A.      I didn't know; but, you see, that's who he believed did.

> Q.      That's what my question was.  You didn't tell him that, did you?

A.     No, no, no.

Q.     Did you tell him you believed Mr. Frankenfield did it?

A.     No.  I wouldn't do that.  That's just starting – I don't get involved in that.

(Dep. of Mann, 03/31/06, pp. 143, l. 23-24, p. 144, l. 1-24, p. 145, l. 1-4.)


Therefore, the allegations of paragraphs 23 and 24 fails as a matter of law to support any violation of Title VII.


B.     THOSE PARTS OF COUNT II OF THE COMPLAINT AGAINST THE LOCAL 36 RELATING TO THE RACIAL HARASSMENT AT THE CONECTIV SITE SHOULD BE DISMISSED AS A MATTER OF LAW SINCE THERE IS NO EVIDENCE THAT THE UNION RATIFIED, INSTIGATED, OR ACTIVELY SUPPORTED ANY DISCRIMINATORY ACTS.


A close review of the Plaintiff's Complaint as it relates to Local 36 reveals two separate alleged violations of Title VII by the Local 36.  Plaintiff sets forth the Union's "conduct of discrimination" in paragraph 54 and its subparagraphs.  Although not clearly articulated, the Plaintiff's theories of illegal discrimination under Title VII by the Union arise (1) out of the racial harassment arising at the Conectiv site while Slater was employed by Steel Suppliers and (2) the Union's operation of its exclusive hiring hall and job referral system.[2]  Undoubtedly, this litigation in reality concerns the first issue and not the second, although the Union will also address the second issue.

Labor organizations are subject to the prohibition against racial discrimination under Title VII pursuant to § 703(c), 42 U.S.C. § 2000(e-2)(c).  That section provides as follows:

---

[2] Paragraph 54(a)-(e) cover the first category and 54(f)-(l) the second category of alleged discrimination.

(c)  Labor organization practices

It shall be an unlawful employment practice for a labor organization—

(1)  to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2)  to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3)  to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(Federal Labor Laws, p. 1332.)


This section of Title VII imposes duty and responsibility upon labor organizations such as Local 36 not to discriminate on the basis of race.  However, it does not impose any liability upon the Local 36 under the admitted facts of this case.

Judicial construction of this section of the Act commences with *Goodman vs. Lukens Steel Company,* 42 U.S. 656, 107 S.Ct. 2617, 96 L.Ed. 2d 572 (1987), through cases both in this circuit and other circuits, as well as District Court cases, and one State Supreme Court case.  All of these cases are consistent in their holdings and clearly support the Union's position that there is no liability in Title VII in this case.

In *Goodman,* the evidence established that the Union had decided as a matter of policy not to file grievances under the terms of the CBA alleging complaints of

18

discrimination by black members of the bargaining unit because the Company was hostile to such complaints. The evidence established that the Union feared that this hostility would make it harder for the Union to succeed in its dealings with the Company. The Supreme Court clearly found liability in that case since the basis for the Union's decision whether or not to pursue a grievance was based upon the racial nature of the grievance.

Subsequent to the Supreme Court's decision in *Goodman,* there are three (3) seminal cases decided by the Third, Seventh and Eighth Circuits, all of which hold that a Union may be held liable under Title VII only if "the Union itself instigated or actively supported the discriminatory acts."

The Third Circuit in *Anjelino vs. The New York Times Co.,* 200 F.3d 73 (3d Cir. 1999) upheld the District Court's dismissal of Title VII claims against the Union, "because the Union was not the employer of the appellants; this is so, even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union." *Id.* at 95. The Third Circuit stated that a Union may be held liable under Title VII when the record demonstrates, "that the Union itself instigated or actively supported the discriminatory acts allegedly experienced by the appellants." *Id.* at 96.

The Seventh Circuit in *EEOC vs. Pipefitters Association Local No. 597,* 334 F.3d 656 (7th Cir. 2003) also had an opportunity to address the issue of what responsibility a Union has for racial discrimination on a construction job site. The facts of *Pipefitters Local 597* are almost identical to this case. In *Pipefitters Local 597,* the EEOC bought a racial harassment claim under Title VII and § 1981 on behalf of eight (8) African-Americans. The racial harassment that occurred consisted of graffiti on the portable

19

bathroom walls with slogans such as "Death to all niggers," and "Fuck niggers"; placement of a swastika in an African-American employee's toolbox; the posting of a Ku Klux Klan poster in a trailer used by African-American Pipefitters, and the display of a hangman's noose.  Contending that the Union was liable, the EEOC argued that "When the harassers and the targets are represented by the Union, the Union has exactly the same legal responsibility as the employer." *Id.* at 659.

The Seventh Circuit disagreed and held that (1) a Union does not have an affirmative duty to prevent discrimination in the workplace and (2) the Union was not liable on any theory of selective inaction.  In finding that there was no affirmative duty on part of the Union, the Seventh Circuit reasoned principally on the theory of power and control:  (a) the Employer, not the Union, controls the workplace, including control over the portable bathrooms; (b) the Union is not the Employer, but is the worker's agent in dealing with the Company; (c) the Employer is in a better position than the Union to prevent and eliminate harassment because it can discipline employees; and (d) the Union's power is more limited than that of the Employer in effectuating changes in personnel and work rules.  Citing *Goodman,* the Court noted that the Union violates Title VII if it discriminates in the performance of its agency function but not otherwise. "Thus, a Union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination.  But if it merely fails to effectuate changes in the workplace – if for example, it urges the Company to take steps to prevent harassment and the Company fails to do so – the Union is not guilty of discrimination, although the Company is." *Id.* at 659.

20

The Seventh Circuit did note, however, that liability could exist if the Union's inaction to prevent racial harassment such as that which existed at the workplace in that case was selective inaction. The Court noted that there are two (2) types of such selective inaction. The first is where "A black worker asked the Union to grieve a Complaint, the Union refuses, though if the worker were white the Union would grieve his Complaint." The Court noted this would be a clear violation of § 703(c) of Title VII. The second type of case would be one where the Union decided as a matter of policy not to grieve complaints of discrimination by black members of a bargaining unit because the Company was hostile to such grievances. These were essentially the facts in *Goodman*. Again, this would be clearly illegal under Title VII. But the Court specifically rejected that the Union had an affirmative duty to file grievances on its own or otherwise take affirmative action to prevent discrimination in the workplace.

The other Circuit Court of Appeals decision that is instructive is *Thorn vs. Amalgamated Transit Union,* 305 F.3d 826 (8th Cir. 2002). The Plaintiff in *Thorn* actually complained to the Union Steward that she was a victim of ongoing and unwelcome sexual advances, requests for sexual favors, and communications of a sexual nature by male co-workers and supervisors at her worksite. She accused members of the Union of the alleged sexual harassment. However, she did not file or attempt to file a grievance request with the Union against the employer.

> Nothing that *Thorn*'s Complaint "does not allege that she requested (the Union) to file a sexual harassment grievance against (the Employer)", the District Court dismissed the sexual harassment claims because, "Plaintiff has failed to allege conduct beyond passivity on the part of the ATU and the Local Union." The Plaintiff argued that

21

her Complaint was sufficient to state a sexual harassment claim because, "Unions have an affirmative duty under Title VII . . . to take remedial action to end discrimination amongst their members."

*Id.* at 832.

The Eighth Circuit disagreed, holding as follows:

> Though the Unions were prohibited from causing or assisting unlawful discrimination by *Thorn's* employer, nowhere in either statute do we find language imposing upon unions an affirmative duty to investigate and take steps to remedy employer discrimination.  *See, E.G. Anjelino vs. New York Times Co.,* 200 F.3d, 73, 95-96 (3rd Cir. 1999) ("while a union may be held liable under Title VII the record here does not demonstrate that the union *itself* instigated or actively supported the discriminatory acts allegedly experienced by the appellants.  Therefore, the union is not liable."  Furthermore, imposing such a duty would place unions in an untenable position whenever one member accused another member of causing the employer to discriminate.
>
> ***
>
> A Union, unlike an employer, is a democratically-controlled institution directed by the will of its constituents, subject to the duty of fair representation.  Like other representative entities, Unions must balance the competing claims of its constituents.  *(Goodman,* 482 U.S. at 688-89, 107 S.Ct. 267 (*Powell, J.,* concurring in part and descending in part).

Since the Plaintiff did not allege that the Union refused to file a grievance or otherwise assert a sexual harassment claim against the Employer on her behalf, the Circuit Court affirmed the District Court and dismissed her Title VII complaint.

Finally, the Alaska Supreme Court has had the opportunity to rule on this

22

identical issue.  This was another sexual harassment claim in which the Plaintiff sued the

Union because of threatening and vulgar graffiti in her work area and the men's

outhouse.  There were also altered pictures of her with sexual profanity and other

sexually derogatory drawings.  The Plaintiff reported the incidents to her stewards on the

job site.  However, she did not ask any of the stewards or any other union official to file a

grievance under the terms of the CBA for any of these instances.  Instead, she quit her

employment.  She then sued her Union, basing her arguments on *Goodman*.

The Alaska Supreme Court rejected her arguments, citing with approval

*Pipefitters Local 597, Thorn,* and *Anjelino*.  It held as follows:

Most federal courts that have addressed the issue have not imposed liability on a union for failing to remedy a discriminatory work environment.  [FN19] In *EEOC v. Pipefitters Ass'n Union Local 597,* the Seventh Circuit explained that unions have no duty to remedy racial or sexual harassment because they typically do not control the workplace:

The employer is in a better position than the union to prevent or eliminate harassment because it can discipline its employees; the union cannot.  If a worker complains to the union that he is being harassed, all the union can do is file a grievance on his behalf against the employer; the union cannot eliminate the harassment itself – that is the company's responsibility . . . A further consideration is that members of different unions, or union and nonunion workers, often find themselves working at the same site . . . The pipefitters union had no control over workers belonging to other union . . .  [ [FN 20] ]

However, the court noted that its analysis might differ in cases where a collective bargaining agreement delegates more power to a union to control the workplace. [FN21]

In addition, the Seventh Circuit did not require a union to take the initiative to address workplace harassment to the limited extent that it can because "inaction, unless invidious, is not discrimination in any accepted sense of the term."  [FN22] Imposing such an affirmative duty might force a union to take

23

> sides in conflict with its statutory duty to fairly represent all
> workers.  [FN23]  The Seventh Circuit thus concluded that "[i]f [a
> union] discriminates in the performance of its agency function, it
> violates Title VII, but not otherwise."  [FN24]  Because no one
> attempted to file a grievance or even complained to a union official
> in his representative capacity in <u>Local 597,</u> the union had no duty
> under Title VII to address the racial harassment at the workplace.
> [FN25]

    *Id.* at 1075.

    In further response to plaintiff's arguments, the court in *Ellison,* clarified
some of the finer distinctions often missed in cases:

> *Ellison* cites to a number of cases that she asserts establish
> that "a union may not sit idly by when it knows or should know" of
> workplace sexual discrimination.  First, none of these cases holds
> that constructive notice along is enough to impose liability on a
> union for an employer's discrimination.  [FN26]  Second, even
> though some of these cases ostensibly follow the acquiescence
> theory, they base Title VII liability on the unions' own actions, not
> simply their inaction in the face of actual knowledge of
> discrimination.  [FN27]  The unions themselves were accused of
> discriminating in these cases by denying members' requests to
> pursue grievances out of deference to the desires of the harassers
> [FN28] or because of policies not to assert sexual harassment-
> based grievances.

> *5 [3] We are persuaded by the consensus view of the
> federal authorities represented by such cases as *Local 597,* [FN30]
> *Thorn v. Amalgamated Transit Union,* [FN31] and *Anjelino v. New
> York Times Co.* [FN32]  Therefore, we conclude that under
> AS.18.18.220, a union may only be liable on account of an
> employer's discriminatory harassment when (1) the harassed
> worker asks the union to take action within its representative
> capacity, such as by filing a grievance, and (2) the union decides
> not to pursue the complaint for discriminatory reasons.

    *Id.* at 1075-76.

    *Eliserio vs. USW Americo Local 310,* 398 F.3d 1071 (8th Cir. 2005)(*citing with

approval Thorn* and *Anjelino*) is an instructive case because in that matter, one of the

Plaintiff's arguments was that the Union instigated or actively supported racial graffiti. In particular, it argued that it was likely that Union members created the graffiti. The Court rejected this argument, noting that even if some Union members created the graffiti does not give rise to a Title VII claim against the Union. Not only do unions have no duty to take remedial action for the discriminatory acts by individual members, but it was the Plaintiff's burden to show that the Local Union, as an organization, instigated or actively supported their racially harassing graffiti. *Id.* at 1077. Of course, Slater has not even attempted this argument since there is no evidence that members of Local 36 created the graffiti, much less that the Local 36 as an organization instigated or actively supported the graffiti. In fact, it is arguable that non-Local 36 members created the graffiti since some of the graffiti stated "Who let J.T. into Local 36?" J.T. is a nickname for Slater.

In summary, all of these cases hold that the Union has no affirmative duty to remedy racial discrimination in the workplace.[3] It has an affirmative duty to process grievances in a non-discriminatory basis should a member file or request to file a grievance. But absent such a grievance or request for a grievance, it owes no affirmative duty even if the alleged discriminatory harassment is brought to its attention by the Plaintiff.

The facts of this case are less in favor of the Plaintiff than the Plaintiffs in *Pipefitters*, *Thorn, Ellison*, or *Eliserio*. In each of those cases, the Plaintiff brought to the Union's attention the alleged discriminatory act, although none of the Plaintiffs asked the Union to file a grievance. In this case, Slater and every witness who has testified agreed

---

[3] *See also Madsen vs. Milton Hershey School,* Case Nos. CV-05-4, 2005 WL 1651961 (M.D. PA 2005).

that he never brought the discriminatory actions to the attention of the Union or requested that the Union file a grievance or file a grievance on his own under the terms of the CBA. Consequently, his claim must fail under Title VII.

David was the Grievant's steward on the job site during the relevant time period. David was directly asked on at least five occasions whether Slater asked him to file a grievance concerning the alleged racial harassment.  The responses are as follows:

> Q.     Between June and August of 2002, did anyone ever complain to you about the racial graffiti in the portable toilets on the Conectiv worksite in Bethlehem, Pennsylvania?
>
> MR. TAGLIOLI:     I object to the form.
>
> MR. COOK:     Go ahead.
>
> THE WITNESS:     No.

(Dep. of David, 04/03/06, p. 27, l. 20-24, p. 28, l. 1-3.)

> Q.     During the time that you were the steward for Steel Suppliers on the Conectiv project in Bethlehem, Pennsylvania, did you ever receive a complaint of racial harassment?
>
> A.     No.

(Dep. of David, 04/03/06, p. 36, l. 24, p. 37, l. 1-4.)

> Did James Slater ever talk to you about the racial graffiti on the portable toilets?
>
> A.     No.
>
> Q.     Did James Slater ever talk to you about any of the graffiti on the inside of the portable toilets?
>
> A.     No.
>
> Q.     Did James Slater ever complain to you about any racial problems he was experiencing on the Conectiv job site in Bethlehem, Pennsylvania?

26

  A. No.

(Dep. of David, 04/03/06, p. 57, l. 12-22.)

  Q. It's your testimony that James Slater never came to you to complain about racial graffiti in the portable toilets, correct?

  A. Correct.

  Q. Or any other racial issue he was experiencing on the Conectiv project in Bethlehem, Pennsylvania, correct?

  A. Correct.  I had no idea there was any racial tension on the job at all or I would have taken more notice to what was written in the porta-johns or just everything that was going on.

(Dep. of David, 04/03/06, p. 62, l. 19-24, p. 63, l. 1-5.)

  Q. Did anybody ever talk to you, whether above you or below you, about the writings on the wall?

  A. No.

(Dep. of David, 04/03/06, p. 97, l. 8-10.)


  Kilpatrick's testimony was the same.  His affidavit is consistent with David's testimony; i.e., Slater never brought to his attention, much less filed a grievance or asked a grievance to be filed, alleging racial discrimination.  (RKF Affidavit.)

  To that extent, the testimony of every witness universally acknowledges the procedure for complaints and grievances that arise at the work site.  (Exh. G, Kilpatrick Affidavit, ¶7; Exh. G, Kilpatrick Affidavit, ¶¶8, 34; Exh. B, Dep. of Frankenfield, pp. 32, 43, 49-51; Exh. C, Dep. of Slater, pp. 220-239; and Exh. E, Dep. of David, pp. 36, 73,

95).  In particular, the CBA between the parties sets forth the grievance procedure in Article XII (pp. 24-25.)  That procedure provides that if there is any dispute concerning the interpretation or application of the CBA, there shall be an attempt to resolve the matter first between the foreman and the steward on the job and/or the business agent.  In the event it is not resolved at the steward level, an attempt to resolve the matter will be done by discussion between the business agent and the employer.  If there is no resolution, then the Union can proceed to arbitration under the rules of the American Arbitration Association.  So, for instance, had Slater asked the steward or the business manager to file a grievance on his behalf alleging that Steel Suppliers was violating the anti-discrimination provisions of the CBA (Article VIII, Section 8) and David or Kilpatrick had refused to do so because one of the discriminatory reasons described in *Pipefitters Local 597* then perhaps Slater would have a viable Title VII claim.  However, Slater never asked the Union to take any action on his behalf.  Slater's testimony on that issue is clear.  Slater was familiar with the grievance procedure, as he had acted as a steward with an employer other than Steel Suppliers.  (Dep. of Slater, 02/28/06, p. 20.)

> Q.      Is that your complaint about Local 36 in this particular case, that the local did nothing about the comments that were being made?
>
> A.      That would be, again, the chain of command, the shop steward.
>
> Q.      Did you speak to Mr. David concerning your allegations of racial harassment?
>
> A.      No.  Can I finish?
>
> Q.      If it's responsive to my question.
>
> A.      Yes, it is.  Because he witnessed all of the racial comments, he was in the room.  So me saying anything to him would be obsolete.

Q.     Did you speak to him concerning the racial statements or insignias that were in the toilets?

A.     No.

Q.     Just as a follow-up on that, you knew Mr. David reasonably well from your working there?

A.     How well?  I knew of Mr. David.

(Dep. of Slater, 02/28/06, p. 239, l. 2-19.)

The Complaint against Local 36 is based upon an unsound and clearly rejected legal theory.  The Plaintiff's entire theory is now and has always been since the date he filed his charge with the EEOC that the Union has an affirmative duty to correct workplace discrimination.  (Exh. M.)  The Plaintiff's theory has never been that the Union refused to process complaints or grievances by Slater concerning racial discrimination at the work site.  To the contrary, even now at this stage in the litigation, the Plaintiff still asserts that whether or not Slater filed a grievance or requested a grievance to be filed is not the issue.  The issue is whether or not the Union was aware of the racial harassment and did nothing about it.[4]  Unfortunately for the Plaintiff, his theory is not supported by any judicial authorities.  To the contrary, even in those cases such as *Thorn*, *Pipefitters Local 597*, and *Ellison* where the Plaintiffs complained to the stewards or business representatives concerning the racially or sexually discriminatory conduct, liability did not occur to the Union's absent specific evidence that the Union refused to process the Grievance because of racial or gender-based reasons.  This case is even more compelling because Slater admits, and Kilpatrick and David acknowledge, he did not even complain, file a grievance, or request that a grievance be filed against Steel

---

[4] Defendant will address the Plaintiff's arguments more fully in its Brief in Opposition to Plaintiff's Motion for Summary Judgment.

29

Suppliers.  Thus, Count II of his Complaint should be dismissed to the extent it alleges a violation of Title VII for a racially hostile work environment as the Conectiv site in Bethlehem.

Finally, it is highly instructive how this litigation arose.  The Plaintiff filed a charge with the EEOC against Local 36 alleging violations of Title VII because of the activities at the Conectiv site.  The Plaintiff also filed charges against Conectiv and Steel Suppliers, the owner of the site and the Plaintiff's employer at the site.  The EEOC found merit in those charges as to Conectiv and Steel Suppliers and filed a Complaint against both of them.  It did not file a Complaint against Local 36.  There is a reason for that decision.  There is no basis in law to support Plaintiff's theory that Local 36 had an affirmative duty to eliminate racial discrimination in the workplace.  The EEOC has tacitly acknowledged this by not filing a Complaint against Local 36, since the clear and established case law commencing with *Goodman* and all the afore-cited cases do not impose liability upon a local union under these circumstances.  There is no evidence that the Local 36 instigated, ratified, or actively supported discriminatory acts, either through direct intentional action at the job site by its agents or by refusal to process grievances because of a racially discriminatory reason.  There is no evidence any of that occurred in this case and therefore the EEOC did not sue Local 36.

     C.     THE PLAINTIFF'S ALLEGATION OF A VIOLATION OF TITLE VII BY LOCAL 36 IN THE MANNER WHICH IT OPERATED ITS HIRING HALL/REFERRAL SYSTEM SHOULD BE DISMISSED SINCE THERE IS NO EVIDENCE OF ANY RACIAL DISCRIMINATION.

          1.  There is no evidence of racial discrimination, specifically as to Slater or generally as to other unnamed individuals.

The Plaintiff's Complaint establishes no factual allegations whatsoever in support of his conclusionary statements in paragraph 54 of his Complaint that Local 36 violated Title VII by operating its hiring hall/referral system in a racially discriminatory fashion. In contrast to the very specific factual allegations concerning racial harassment at the Conectiv site, there are no facts alleged in the Complaint in support of Plaintiff's allegations about the hiring hall/referral system. The reason for the lack of any factual assertions concerning the referral system/hiring hall is that there is no evidence and none has been developed in discovery. Since there are no factual allegations in the Complaint, it is somewhat difficult for Local 36 to address potential claims by the Plaintiff. However, to ensure that the matter is addressed and dismissed, the Local 36 will assume that the Plaintiff may raise arguments even though there are no facts to support them.

The only section of the Complaint in which Slater alleges discrimination in the operation of the hiring hall and referral system is paragraph 54(f)-(l). The factual record that has developed is that Slater was unable to present any evidence whatsoever concerning any of these allegations. (Exh., C, Dep. of Slater, 02/28/06, pp. 224-236.) Nowhere does Slater allege any facts to support his allegations.

The reason that Slater was unable to allege any facts in support of an allegation that the Local 36 was discriminatory in any fashion is that there is no evidence. Every black applicant who requested participation in the apprenticeship program or membership in the Local was accepted for membership. (Exh. G, Affidavit of Kilpatrick, ¶21.) Further, the referral and hiring hall system was operated in a completely non-discriminatory fashion. Union members were referred to requesting employers three (3)

31

ways.  First, if an Employer makes a request for that particular employee, the business

manager contacts the member and notifies him that the Employer has requested his

services.  Second, if the employee contacts the business manager requesting employees

with particular skills or abilities, then only those employees who have signed the referral

sheet or have not worked according to the logbook that have those skills and abilities are

sent to work for the requested employer.  Finally, if there are no skill and ability issues,

then the Union refers members to work who have signed the referral sheet and are at the

Union hall, ready to be dispatched in the event they are already to be sent to work for the

requested employer.  In the event there are insufficient number of employees who are at

the Union hall who have signed a referral sheet, then the business manager contacts

members based upon those who are out of work based upon his logbook.  (Exh. G,

Kilpatrick Affidavit, ¶¶16-17.)

The Defendant has no burden whatsoever in this matter and the burden is on the

Plaintiff to establish some evidence of racial discrimination in the operation of the hiring

hall and referral system.  *Lucas vs. International Association of Bridge, Structural and*

*Ornamental Ironworkers,* 741 F.Supp. 136, (N.D. OH (1989)) is instructive.  In *Lucas,*

the Plaintiffs sued under Title VII alleging that the Union's hiring hall was racially

discriminatory.  The Court noted that there were two (2) theories of liability under Title

VII, disparate treatment and disparate impact.  Disparate treatment requires

discriminatory motive, but disparate impact only requires evidence that employment

practices which are adopted without a deliberately discriminatory nature, may in

operation be the functional equivalent to discrimination.  Noting that disparate impact

cases require the Plaintiff to identify a specific employment technique which has a

discriminatory effect and therefore, Plaintiff must "offer statistical evidence of a degree sufficient to show the practice in question has caused the exclusion of application for jobs or promotions because of their membership in a protected group. *Id.* at 139. The Plaintiff in *Lucas*, as opposed to Slater, actually had a statistical expert to present evidence showing a disparity between the amount of hours worked by black ironworkers and all other ironworkers. The analysis was based on the total number of hours accumulated by ironworkers of different races, which purportedly showed the Union's referral practice had a discriminatory effect.

The hiring system in *Lucas* was exactly the same as the present one; i.e., employees can find employment in one (1) of three (3) ways. The first was a referral system where an individual signs an out-of-work book and that upon signing the register, they are placed at the bottom of the list. As the employers request workers, the Union refers those listed on the register in successive order that their names appear thereon. The Court noted there was no evidence that any Plaintiff was denied from signing the referral book, nor any evidence that any of the systems were not routinely followed, the Plaintiffs nonetheless complained of discrimination because of a statistical analysis. The Court rejected the expert opinion noting that the statistics presented do not take into account other factors which could have accounted for the number of hours worked by black ironworkers vs. white ironworkers.

In any case, there is no evidence whatsoever presented by Slater to even make the disparate treatment argument. There is no statistical evidence presented, nor has any been identified in discovery. The only possible claim that Slater may raise is that he was

33

not referred to work, even though he signed the referral sheet, and that the reason was because of his race.  This argument has no merit.

First, Slater was proffered no evidence whatsoever that race is the reason he was not referred to work.  In fact, Slater's testimony was that he was not referred to any work after he went to his attorney in late November to file his EEOC charge.  He then alleged the Union refused to assign him work after that date.  (Exh. C, Dep. of Slater, 02/28/06, p. 225.)

That evidence standing alone does not establish racial discrimination.  Slater would first have to show that he was available for work.  The evidence reveals that after Slater voluntarily left employment in March of 2003, he did not return to the Union hall for work until July 17, 2003.  For the period from July 17 to October 21, over three (3) months, Slater appeared at the Union hall to sign up for work 12 times.  Out of those 12 occasions, he appeared early in the morning only three (3) times on July 23, October 3, and October 7.  The other times he appeared at times of the day for which there was no work to which the Local Union could have referred him.  (Exh. G, Affidavit of Kilpatrick, ¶23.)  Nonetheless, Slater acknowledged that in October 2003 he was referred to another job at IEW in Bloomsburg, New Jersey.  (Exh. C, Dep. of Slater, p. 24.)  That referral occurred in October 2006.  He then signed the referral sheet at 10 a.m.  He then never appeared again.  Thus, even though Slater had been referred to work as recently as October 2003, he elected not to remove himself from the referral system by not appearing.

34

Apparently it is Slater's argument that because he did not have work after he returned from Tennessee in July 2003, the Union engaged in discriminatory practices. There are numerous reasons why Slater was not referred to work until October 2003. First, there had been a general slowdown in labor and there were substantial numbers of out-of-work ironworkers.  Most of them were journeyman as opposed to Slater, who was an apprentice.  Journeymen because of their skill and ability, clearly take preference on referrals rather than apprentices.  Secondly, while Slater only signed up for work on the referral system on 12 days in the space of over three (3) months, and out of those 12 days, he only appeared on three (3) occasions at a time early enough to be sent to a potential referring employer.  All of these reasons are clearly non-discriminatory reasons for Slater not working.

Allegations of racial discrimination under Title VII in the operation of a hiring hall or referral system are subject to the standards set forth in *McDonnell Douglas Corp. vs. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d. 668 (1973).  First, the Plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. *Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377-78; *Burdine,* 450 U.S. at 252-53, 101 S.Ct. at 1093-94.  Second, once the Plaintiff proves a *prima facie* case, the burden shifts to the Defendant to produce evidence of legitimate, non-discriminatory reasons for the challenged action.  *Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94.  Third, if the Defendant meets this burden, the Plaintiff must prove by a preponderance of the evidence that Defendant's asserted reasons are merely

35

pretextual. *Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94. The ultimate burden of persuasion as to discriminatory intent remains at all times with the Plaintiff. *Patterson,* 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093-94.

In applying the *McDonnell Douglas* analysis, the Plaintiff must establish a *prima facie* case against the Local by showing that (i) he belongs to a racial minority; (ii) he was qualified and requested a referral to a job to which the Local was referring applicants; (iii) despite his qualifications, he was not referred and (iv) after his non-referral, the Local continued to refer applicants with Plaintiff's qualifications to available jobs. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Mills vs. International Brotherhood of Teamsters,* 634 F.2d 282, 285 (5th Cir. 1981); *NAACP Labor Committee of Front Royal Virginia vs. Labors International Union of North America,* 902 F.Supp. 688 (W.D.Va. 1993).

Slater has not made out a *prima facie* case. He has not presented any evidence other than establishing he belonged to a racial minority. He has not established he was qualified and requested a referral to a job which Local 36 referred applicants. He has certainly not identified what particular job to which he was not given a referral, and that others were. He certainly has not established that the Local continued to refer applicants with his qualifications to any available jobs. And even if somehow the Court could construe blanket assertions as the required evidence needed to make out a *prima facie* case, he has failed to rebut the Defendant's proffered non-discriminatory reasons for his

36

lack of referral after July 17, 2003 when he first signed the referral list.  Undoubtedly, there is no evidence to support this part of Count II and it should be dismissed.

> ### 2.  The allegations of Count II of the Plaintiff's Complaint concerning the operation of the hiring hall and referral system are not reasonably contemplated within the underlying charge.

In addition, to the lack of a *prima facie* case, Plaintiff's Complaint as to the hiring hall and referral system should be dismissed for a procedural reason.   It is now elemental that a Plaintiff under Title VII must file a timely Charge with the EEOC or the PHRC before initiating a suit in federal court.  *Love vs. Pullman,* 404 U.S. 522, 91 S.Ct. 616, 36 L.Ed. 2d 679 (1972).  The Third Circuit has held that the requirement that an aggrieved party file a Complaint with the EEOC before filing in federal court is an integral part of Title VII statutory screen.  *Ostapowicz vs. Johnson,* 541 F.2d 394 (3rd Cir. 1976).  "While preliminary requirements for a Title VII action are to be interpreted in a non-technical fashion, the aggrieved person is not permitted to bypass the administrative process."  *Id.* at 398.  Thus, the parameters of the civil action in the District Court are defined by the scope of the EEOC investigation.  Only claims which can be reasonably expected to grow out of the charge of discrimination filed with the EEOC can be raised to the District Court level.  *See Dockins vs. Flour Daniel/GTI, Inc.,* 2000 WL 1469792 (E.D.Pa. 2000).

In this case there is no mention whatsoever in the EEOC charge that Local 36 discriminated on the basis of race in the operation of its hiring hall, referral system, or any other activity, other than the allegations concerning racial discrimination at the Conectiv site in Bethlehem.  (Exh. M, EEOC Charge.)  There is no connection between

37

the allegations in Count II concerning discriminatory treatment of minorities as it relates

to the hiring hall or referral system, promotions, or any other activities and the EEOC

Charge.

The scope of the EEOC charge defines the parameters of the civil action.  The

scope of the EEOC charge concerns only the alleged discriminatory actions at the

Conectiv site.  It alleges nothing else whatsoever.  Therefore, Slater's allegations of Title

VII violations for anything other than the actions at the Conectiv site; e.g., discriminatory

operation of the hiring hall, referral system, membership, retention, or other activities of

Local 36 on a general basis should be dismissed.  *See Antol vs. Perry,* 82 F.3d 1291 (3rd

Cir. 1996).  There is nothing in the EEOC charge which fairly encompasses anything

other than the Conectiv allegations.  *See also, Spindler vs. SEPTA,* 47 Fed.Appx. 92 (3rd

Cir. 2002)(not selected for publication and not precedential).

> ### 3.  To the extent there is any allegation of discriminatory illegal hiring practices by local 36, the defendant has filed the action against the wrong party.

While there are no factual allegations in the Complaint or otherwise raised in

discovery concerning discriminatory hiring hall/referral system practices, presumably

Slater's theory is that the Local 36 discriminated on the basis of training, retraining, and

upgrading programs.  (Plaintiff's Compl., ¶54(f).)  While there is no evidence to support

those allegations, since they stand barely, the Defendant will address them nonetheless.

As established by Kilpatrick's affidavit, the Local 36 Joint Apprenticeship

Committee is a separate entity from Local 36.  It is a Taft-Hartley Fund, administered by

a joint number of Union and employer trustees.  It is separately funded through

contributions under the terms of the CBA.  (Exh. I, CBA.  See Article VI, Section 9.)  It

is a separate entity, both under the National Labor Relations Act, as well as Internal

Revenue Code.  It and not Local 36, determines the acceptance into the program and

movement through the program as an apprentice.  (Exh. G, Kilpatrick Affidavit, ¶19.)

The operation of an apprenticeship program separate from the Local Union is not unique

and is in fact contemplated by statute.  (29 U.S.C. § 186 (c)(6).)  Just as importantly,

many plaintiffs, unlike Slater, have recognized this and filed Title VII actions against

apprenticeship committees for Title VII violations as opposed to the Local Unions.  See

for example, *Drake vs. Steamfitters Local Union 420,* 144 Fed.Appx. 932, 2005 WL

1950877 (3rd Cir. Court of Appeals 2005, Case No. 05-1493, (not selected for publication

and not precedential); *Webb vs. International Brotherhood of Electrical Workers Local

654,* Case No. 04-3613, 96 FEP 1215 (E.D.Pa. 2005.)

 Therefore, even if Slater somehow raises some factual assertion, which he has not

done through the close of discovery, that the Apprenticeship Program was run in a

discriminatory fashion, he has filed an action against the wrong party.  The

Apprenticeship Committee has not been named as a party in this matter and therefore any

allegations alleging improper administration of the Apprenticeship Program should be

dismissed since Local 36 does not administer the Program – the Committee does so.

 D. PLAINTIFF'S CLAIM UNDER §1981 SHOULD BE
 DISMISSED AS A MATTER OF LAW SINCE IT ALLEGES AN ORAL
 CONTRACT OF EMPLOYMENT BETWEEN THE PLAINTIFF AND
 LOCAL UNION 36 AND THE PLAINTIFF WAS NEVER AN
 EMPLOYEE OF LOCAL 36.

 Plaintiff alleges in Count IV of his Complaint that he is entitled to relief under 42

U.S. § 1981 on the basis of the following allegations:  "In or about 2002, Plaintiff entered

39

into an oral contract wherein Defendant Union employed Plaintiff as a welder."
(Plaintiff's Compl., ¶73.)  Plaintiff then goes on to allege that the Union offered the

Plaintiff a full-time position as an employee and then describes the oral employment

contract as one in which the Union offered him full-time employment, equal opportunity,

and fair and equitable treatment without racial slurs or insults.  (Plaintiff's Compl., ¶75.)

He then notes that based upon the Union's promises under this contract, he "put forth his

best effort and performed all job duties assigned to him and satisfactorily fulfilled all of

his job duties and tasks."  (Plaintiff's Compl., ¶75.)

But Slater was never an employee of Local Union 36 and therefore this count

must be dismissed.  Section 1981 provides:

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce contracts,
> to sue, be parties, give evidence, and to the full and equal benefit of all
> laws and proceedings, for the security of persons and property as is
> enjoyed by white citizens, and shall be subject to light punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to no other.

(42 U.S.C. § 1981.)


Section 1981 provides a private cause of action for intentional discrimination

only.  *Pryor vs. National Collegiate Athletic Association,* 288 F.3d 548, 562 (3rd Cir.

2002).  To establish a claim under this section, Plaintiff must show that:  (1) he belongs

to a racial minority; (2) Defendant had an intent to discriminate on the basis of race; and

(3) the discrimination concerned one or more of the activities enumerated in § 1981,

including the right to make and enforce contracts.  *Id.* at 569.  As pled, the Plaintiff's

theory, therefore, is that since he was a racial minority, the Local Union had an intent to discriminate on the basis of his race and it concerned the oral employment contract between the Plaintiff and Local Union 36.

There is absolutely no evidence to support the Plaintiff's allegation that he entered into an oral employment contract with Local Union 36. (Exh. G, Affidavit of Kilpatrick, ¶¶14-15.) Local Union 36 is a labor organization. It is an unincorporated association made up of approximately 160 to 170 members. Those members pay periodic dues to the Union. The Local Union uses those dues to fund its activities. Those activities primarily consist of entering into collective bargaining relationships with various employers who employ its members. Those CBAs require the signatory employers to pay wages at set rates, contribute to various funds for pension, health and welfare, Annuity, and other benefits, and to generally regulate their working conditions. If the employers violate any provision of the CBA, there is a grievance and arbitration machinery process to enforce the rights set forth in the Agreement. (Exh. G, Affidavit of Kilpatrick, ¶¶10-15.)

In order to fulfill this function as a labor organization, wherein it represents its members for purposes of wages, hours, and conditions of employment with employers, the Union has two (2) employees, Robert Kilpatrick, the business manager, and Ann Blank, the clerical employee. Those are the only employees it has. It does not employ its members. (Exh. G, Affidavit of Kilpatrick, ¶14.) Membership is not employment.

The Court in *Anjelino* came to the same result, except under Title VII analysis. The Court dismissed all claims against the Union because ". . . the Union was not the employer of the appellants; this is so even though some of the supervisors and workers

41

who are alleged to have discriminated against the appellants may have been members of the Union.  While a Union may be held liable under Title VII, the record here does not demonstrate that the Union itself instigated or actively supported the discriminatory acts allegedly experienced by the appellants.  Therefore, the Union is not liable.  *See Carbon Fuel Co. vs United Mine Workers,* 444 U.S. 212, 217-218, 100 S.Ct. 410, 62 L.Ed. 394 (1979); *Burger vs. Ironworkers Local 201,* 843 F.2d 1395, 1429-30 (D.C. Cir. 1988); *See Philadelphia Marine Trade Association vs. Local 291, International Longshoreman's Association,* 909 F.2d 754, 755 (3rd Cir. 1999)." *Id.* at 95-96.  Rather, the Times was responsible for assigning work to the appellants and ensuring that the work was not contaminated with sex- and race-based discrimination and harassment.  The same analysis follows here.

Employment status in Pennsylvania is determined by various factors, including the following:  (1) control of the manner of the work to be done; (2) the responsibility for the result; (3) the terms of the Agreement between the parties; (4) the nature of the work or occupation; (5) the skill required for performance; (6) whether the one employed is engaged in a distinct occupation or business; (7) which party supplies the tools; (8) whether payment is by the time or the job; (9) whether the work is the part of the regular business of the employer; (10) whether there is a right to terminate employment at any time; (11) whether the employee is paid by the alleged employer and (12) whether the alleged employee provides fringe benefits. *Taylor vs. Costa Lines, Inc.,* 441 F.Supp. 783 E.D.Pa. (1977); *Hammer Mill Paper Co. vs. Rust Engineering Co.,* 430 Pa. 365, 243 A.2d 389 (1968); *Stevenson vs. College of Misericordia,* 376 F.Supp. 1324 M.D.Pa. (1974); *Valles vs. Albert Einstein Medical Center,* 569 Pa. 542, 805 A.2d 1232 (2002).

Slater can meet none of these tests.  For the relevant time period during which Slater has alleged racial harassment he worked at the Conectiv site for Steel Suppliers, Inc.  He did not work for Local 36.  Steel Suppliers controlled the manner in which he did the work, paid him his wages, paid for his fringe benefits, had the authority and power to discipline him consistent with the terms of the CBA, directed how he performed his work and when he performed his work, and performed full supervisory duties.  Local 36 did none of this.

Local 36's function as it relates to the Conectiv job site was to refer workers to employers who wish to employ members of Local 36.  If the Employer is willing to be a signatory to the CBA, then the Local refers its members to those employers.  The Local does not control how the work is done, when it is done, by whom it is done.  The Local does not pay wages to the members.  It does not provide fringe benefits to its members. It is not an employer of its members.

Slater's allegations concerning the employment status was limited to two (2) facts.  First, he alleged that Local 36 referred him to employment opportunities with employers.  Second, he noted that he paid dues to Local 36.  (Dep. of Slater, 02/28/06, pp. 21-22.)  Since the Plaintiff does not articulate how this makes him an employee of Local 36, Defendant is left to conjecture in positing arguments.  Suffice it to say that the simple referral of a person by the Union to another entity to perform services for that entity does not make the Union the employer.  The entity, in this case Steel Suppliers, directs and controls the members, pays the members wages, pays the cost of fringe benefits for the members, and controls the worksite.  An excellent example of this

43

relationship between the Employer and the Local Union is the evidence which developed concerning stewards vs. foreman.  Stewards cannot be foremen.  (Exh. G, Kilpatrick Affidavit, ¶7.)  The stewards' function among others is to handle complaints and grievances by members on the worksite.  A foreman's responsibility is to direct and control the members who work for the Employer for whom the foreman is working.  The Local has no control over the direction of the workforce, including its members.

Finally, even Slater acknowledges that he was not an employee of Local 36 but instead was employed by Steel Suppliers and the various other employers to whom he was referred to Local 36 for work.  (Dep. of Slater, 02/28/06, p. 213.)  Therefore, there is no oral contract of employment between Slater and Local 36.  Slater's § 1981 Count must fail.

The final reason Count IV must fail is that there is no evidence of any intentional discrimination by Local 36.  Assuming all facts alleged by Slater, those facts established that the Local 36 steward on the job for Steel Suppliers (David) and Frankenfield who he was working for another employer, were aware of the racial harassment that was occurring in the nature of derogatory writings in the toilets and racially offensive jokes being told in the trailer.  It is then Slater's theory that David, as the steward of Local 36 and Frankenfield as President had an affirmative duty to eliminate this racial harassment. There is no allegation of any intentional conduct by David or Frankenfield or any agent of Local 36.  David's failure to take affirmative action to eliminate discrimination is not,

44

by any definition of the word, intentional conduct.  Thus, Slater's 1981 action must fail

for that reason also.[5]

There is no intentional discrimination.  There are no facts whatsoever to support

any employment relationship.  Count IV must fail.

E.  THERE IS NO EVIDENCE TO SUPPORT THE PLAINTIFF'S
CLAIM THAT LOCAL 36 ENGAGED IN INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS.

In his final Count against all Defendants, the Plaintiff alleges that Local 36 and

other Defendants engaged in intentional emotional distress based upon the facts pled in

the previous paragraphs of the Complaint.  Those facts would include the racial

harassment which allegedly existed at the Conectiv site, and presumably Local 36's

operation of a racially discriminatory hiring hall, and the Local 36's breach of its oral

employment contract.  There are various reasons why that Count must also fail.

Initially, since the Count is predicated upon Local 36's liability based on its

alleged illegal conduct as aforementioned, the Count cannot stand on its own since there

are no individual facts which support it.  In other words, since all three (3) of the

Plaintiffs' theories of liability as to Local 36 fail for the reasons aforementioned, so must

the intentional infliction of emotional distress count since it is based upon the alleged

breach of the aforementioned statutory duties or contract.

---

[5] Slater could have pled and argued throughout this litigation a contractual relationship between Local 36 and Slater.  Slater could have alleged that as a member of Local 36, the Bylaws of Local 36 and the International Constitution form a contract between him and the Local Union, since it is well established that Constitution and Bylaws of Unions are contracts between its members and unions.  Or, Slater could have pled or argued that there was an alleged violation of the *Labor-Management Reporting and Disclosure Act of 1959* (29 U.S.C. §401, *et. seq.*) or the *Labor-Management Relations Act of* 1947, also known as the *National Labor Relations* Act (29, U.S.C. §141, *et. seq.*, as the plaintiffs did in *Anjelino vs. New York Times Co.,* 200 F.3d at 99.  There are of course various factual and legal defenses that Local 36 may have raised.  However, none of those claims are before this Court.

Additionally, there are no facts to support the essential elements of the claim.  To establish a claim in Pennsylvania for intentional infliction of emotional distress, a Plaintiff must demonstrate that the Defendants' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Hoy vs. Angelone,* 554 Pa. 134, 720 A.2d 745 (1988).  "Cases which are found as sufficient bases for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct."  *Id.*  "I(t) is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  *Id.*  (Quoting *Cox vs. Keystone Carbon,* 861 F.2d 390, 395 (3rd Cir. 1998).  Further, "I(t) has not been enough that the Defendant has acted with intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation that would entitle the Plaintiff to punitive damages for another tort."  *Hoy,* 720 A.2d at 754.  (Quoting Restatement (second) of torts, § 46, cmt. d (1965)).

At best, the facts establish that David as a steward was aware of racial slurs in the port-o-potty during the course of Slater's employment with Steel Suppliers and did not take any affirmative action to eliminate that.  He also overheard derogatory racial jokes in the work station and did nothing concerning that.  It is beyond doubt that that conduct does not constitute an act which is so outrageous in character and so extreme in degree to go beyond the bounds of all decency.  In fact, it does not even provide a cause of action

46

under Title VII.  As such, it certainly does not result in intentional tort.  The result may have been different if Slater could prove that the agents of Local 36, and not its members, either told racially derogatory jokes on a pervasive basis or directed or wrote the graffiti. However, there is simply no evidence of that fact because it did not occur.  At best, Slater can identify one (1) member of the Local Union that told a racially insensitive joke in the break room.  Other than that, his entire cause of action relies upon the concept that Local 36 did not affirmatively move to eliminate racial discrimination in the workplace.  That is not an intentional tort.

## V.    <u>CONCLUSION</u>

WHEREFORE, the Plaintiff prays that since all counts against Local 36 fail to state a cause of action as a matter of law, that judgment be entered in favor of Local 36 against James Slater.

Respectfully submitted,

Date:   11/09/06          By:    /s/ QUINTES D. TAGLIOLI, ESQUIRE
                                 QUINTES D. TAGLIOLI, ESQUIRE
                                 I.D. # 30158
                                 512 Hamilton Street, Suite 200
                                 Allentown, PA  18101-1505
                                 (610) 820-9531

                                 Attorney for Defendant Ironworkers
                                 Local 36

48

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EQUAL EMPLOYMENT | : NO. 2:05CV03389-GP |
| OPPORTUNITY COMMISSION, | : (CONSOLIDATED) |
| *et al.,* | : |
| | : |
| Plaintiffs | : THE HON. THOMAS M. GOLDEN |
| vs. | : |
| | : |
| CONECTIV, *et al.,* | : |
| | : |
| Defendants | : |

**<u>ORDER</u>**

AND NOW, this _____ day of _____, 200_ upon consideration of the Defendant, Ironworkers Local Union 36's Motion for Summary Judgment and the responses thereto, it is ORDERED and DECREED that the Defendant Ironworkers Local Union 36's Motion for Summary Judgment is granted and judgment is entered in favor of Ironworkers Local Union 36 against the Plaintiff, James Slater. Plaintiff James Slater's Complaint as to Ironworkers Local 36 is dismissed.  Costs to be assessed against the Plaintiff, James Slater upon application of Defendant Ironworkers Local Union 36.

BY THE COURT:

_____

J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


EQUAL EMPLOYMENT : NO. 2:05CV03389-GP
OPPORTUNITY COMMISSION, : (CONSOLIDATED)
*et al.,* :
: 
     Plaintiff : HONORABLE THOMAS M. GOLDEN
   vs. :
: CIVIL ACTION
CONECTIV, *et al.,* :
:
     Defendant :


## <u>IRONWORKERS LOCAL 36'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>


  1. Ironworkers Local 36 is an unincorporated association of approximately one hundred sixty (160) members.  Its purpose is to represent its members in dealing with various area iron worker employers concerning wages, hours, and conditions of employment such as pension, health insurance and annuities.  The geographic jurisdiction of Local 36 is Eastern Pennsylvania and parts of Central New Jersey.  (Exh. G, Affidavit of Kilpatrick, ¶10.)

  2. Local 36 is affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers.  It therefore is subject to the International Constitution and Local 36's By-Laws.  (Exh. G, Affidavit of Kilpatrick, ¶8; Exhibit H Constitution; and Exhibit K, By-Laws.)

  3. Local 36 has various officers including a president, vice president, business manager, treasurer, financial secretary, recording secretary, executive committee and trustees.  (Exh. H, Constitution, pp. 93-102.)

4.   The duties of the President of Local 36 are to preside over regular and special meetings and to appoint members to committees.  He has no responsibility concerning the collective bargaining relationship with employers.  He has no authority or power on the jobsite to act as a steward or business manager in terms of accepting, resolving, or presenting grievances or complaints (Exh. G, Kilpatrick Affidavit, ¶27; Exh. B, Dep. of Frankenfield, pp. 33, 46; Exh. H, International Constitution, p. 96; and Exh. F, Dep. of Kilpatrick, p. 46.)

5.   At all relevant times hereto, Richard Frankenfield (Frankenfield) was President of Local 36.  (Exh. B (Dep. of Frankenfield, p. 8, lines 20-24.)

6.   The Business Manager is the Chief Executive Officer of Local 36.  He is in charge of daily operations of Local 36 and his supervision over any salaried employees of Local 36.  He has final say over all jurisdictional and internal matters.  He is responsible for appointing stewards at job sites.   (Exh. G, Affidavit of Kilpatrick; Exh. H, Constitution, pp. 98-99.)

7.   At all relevant times hereto, Robert Kilpatrick (Kilpatrick) was Business Manager of Local 36.  (Exh. G, Affidavit of Kilpatrick, ¶2.)

8.   The Business Manager appoints stewards to each job.  The steward's function is to complete and file steward reports for Local 36 concerning reporting hours worked by members who work on job sites.  He is responsible for resolving grievances that may arise under the terms of a Collective Bargaining Agreement (CBA) between Local 36 and the employer.  In the event he is unable to resolve those disputes to his satisfaction, he is responsible for submitting or notifying the Business Manager of the grievance.  (Exh. G, Kilpatrick Affidavit, ¶7; CBA, Article XII; Exh. B, Dep. of Frankenfield, pp. 32, 43, 49, 51; Exh. C, Dep. of Slater, pp. 220-239; Exh. E, Dep. of David, pp. 36, 73 & 95.)

9.  Tony David (David) was the steward for Local 36 at the Conectiv job site from November 2002 to late March 2003.  (Exh. E, Dep. of David, pp. 29-30.)

10.  Periodically, usually every three (3) years, Local 36 enters into collective bargaining negotiations with employers who engage in the business of commercial construction, specifically various aspects of iron work within Local 36's geographic jurisdiction.  Those negotiations result in a CBA which includes, among other terms and conditions, the wages, hours, conditions of employment, fringe benefits (such as health and welfare, pension, annuity benefits), overtime rules, manning requirements, health and safety issues, and jurisdictional issues concerning assignment of work.  (Exh. G, Affidavit of Kilpatrick, ¶11.)

11.  The CBA contains a procedure for disputes and grievances.  The grievance procedure is a three step (3) process.  If Local 36 or any individual member wishes to raise an issue concerning the interpretation or application of the CBA, the first step is a meeting between the steward and the foreman or superintendent of the employer.  If it is not resolved at the first step, the second step is to have a meeting between the Business Manager and a representative of the employer.  If it is not resolved at the second step, the third step is to file a Demand for Arbitration with the American Arbitration Association.  (Exh. G, Affidavit of Kilpatrick, ¶12; and Exh. I, CBA, pp. 24-25.)

12.  Steel Suppliers Erectors, Inc. is a signatory to the CBA.  The terms and conditions of Steel Suppliers employees, such as Slater, at the Conectiv site are set forth in the CBA.  (Exh I, CBA.)

13.  Members of Local 36 find work in one of three (3) ways.  The first is that an individual iron worker may pursue employment directly with an employer who is bound by the CBA.  The second method by which a member can obtain work is by a signatory

employer making a request for that specific worker by name.  Those circumstances occur when the employer contacts the Business Manager and requests a particular member/worker to work for that employer at a particular construction site.  In that event the Business Manager contacts the member/worker and notify him that he has been requested to work for that employer at a particular job site.  (Exh. G, Affidavit of Kilpatrick, ¶16.)

14.   The third method that members obtain work through Local 36 is through the referral system.  The referral system is made up of two (2) parts known as a referral list and an out of work list.  The out-of-work list is a multi-page notebook that the Business Manager maintains on a daily basis.  In that book the Business Manager records all employees who were referred to a particular employer, the date of the referral, and the date they ceased working.  Through this process the Business Manager is able to keep a record of all members who are not presently working and the dates they last worked.  The referral list system is a system maintained at the Local Union hall.  Each morning the referral sheet is set out for any out of work member to sign.  The member signs his name on the referral sheet.  The Local Union hall is usually open by the Business Manager by 6:00 a.m. at the latest Monday through Friday.  In the event employers request workers, I then review the referral list to determine what members have signed on the referral sheet and are at the hall available for work.  In order to be eligible for the referral system a member must sign this out of work book.  As employers request workers the Business Manager refers those members listed on the out-of-work register in successive order that their names appear.  In other words, it is a first come first serve basis.  Those members who sign up the earliest get referred out to work first, assuming they have the skill and ability that the employer is requesting.  The members must be present in the Local Union

hall and must have signed in that day in order to be eligible for a referral.  Employers may request certain workers who maintain specialized skills pursuant to the referral board.  When this occurs, the Business Manager assigns those workers who present such skills.  In the event that there is an insufficient number of members who have signed the referral sheet that morning, the Business Manager reviews out-of-work book to determine if there are iron workers available for work who have not signed the referral list that day. The Business Manager then calls the workers at their telephone number that they have registered with the Local Union hall.  (Exh. G, Affidavit of Kilpatrick, ¶17.)

15. Employers contacts the Business Manager requesting workers either the night before the workers are needed or early the next morning.  It is extremely unusual for the Business Manager to make any referrals out of the Local Union hall after 7:00 a.m. as the usual and customary starting time for all iron worker contractors is 7:00 a.m.  It is customary for most iron workers to appear at the Local Union hall and sign the referral sheet between the hours of 5:30 a.m. and 7:00 a.m.  Once the referral is made, the Local Union has no control over how the job is performed.  The members appear at the assigned work site and are under the direction and control of the signatory employers through their supervisors and assigned foremen.  Local 36 does not determine in any way how the job is performed.  Its function on the job sites, through the steward and the Business Manager, is to handle any complaints or grievances that members may report which allegedly are in violation of the CBA between the signatory employers and Local 36.  (Exh. G, Affidavit of Kilpatrick, ¶18.)

16.  Iron Workers Local 36's Apprenticeship Committee is made up of an equal number of employer representatives and Union members, three (3) for each.  It is funded through contributions made by the employers as required by the CBA.  The Local 36

Joint Apprenticeship Committee is a separate and distinct entity from Local Union 36. Its funding is separate and it is a separate entity just as the Iron Workers District Council Health and Welfare Fund, Iron Workers District Council Pension Fund, Iron Workers Local 36 Annuity Fund, and Iron Workers Local 36 Vacation Fund are all separate entities formed and regulated pursuant to Section 302 of the *Taft-Hartley Act* (29 U.S.C. § 186) and qualified under Section 503(c) of the *Internal Revenue Code*. The operation, administration, and finances of the Apprenticeship Committee are separate and part from Local Union 36 as required by law. (Exh. G (Affidavit of Kilpatrick, ¶19).)

17. New members of Local 36 are admitted to membership either as journeymen or as an apprentice. A journeyman iron worker is one who transfers his membership from another Iron Worker Local to Local 36. An individual becomes a member of Local Union 36 as an apprentice by applying for admission into the Apprenticeship program. The application for the apprenticeship program is made through the Apprenticeship Committee not through the Local Union. The Apprenticeship Committee interviews applicants for admission and accepts them based upon their skill, ability and willingness to work. If an applicant is accepted as an apprentice by the Apprenticeship Committee, then he is also submits a separate application for membership into Local Union 36 as an apprentice member. (Exh. G, Affidavit of Kilpatrick, ¶20.)

18. At all relevant times hereto, Local 36 had two (2) employees, Kilpatrick as its Business Manager and Ann Heckenberger (Heckenberger) as a clerical employee. Local 36 pays their salaries and fringe benefits. Local 36 has no other employees. (Exh. G, Affidavit of Kilpatrick, ¶14.)

19. Members of Local 36 who worked for various signatory employers of the CBA are paid wages and provided benefits by the employer. Their job duties are

assigned by the employer.  Their job functions are assigned by the employer.  They are under the direction and control of the employer.  Local 36 does not perform any of these functions.  (Exh. G, Affidavit of Kilpatrick, ¶15.)

20.   James Slater (Slater) applied to the Apprenticeship Committee to be an apprentice iron worker in 2001.  His application was accepted.  He applied for the membership with Local 36 in 2001.  His application was accepted.  (Exh. G, Kilpatrick Affidavit, ¶24; Exh. C, Dep. of Slater).)  Slater was referred to approximately ten (10) different employers from August 2001 through July 2002 (Exh. G, Affidavit of Kilpatrick, ¶24.)

21.  Slater was referred by Local 36 in late July 2002 to work for Steel Suppliers Erectors, Inc. at the Conectiv site in Bethlehem, Pennsylvania.  Slater worked at that site as an Apprentice iron worker for Steel Suppliers continuously from July 26, 2002 to March 28, 2003.  (Exh. C, Dep. of Slater; Exh. E; Dep. of David).

22.   Slater never requested David, as steward to file a complaint or grievance alleging racial discrimination or harassment at the Conectiv worksite under the terms of the CBA or otherwise while he was employed by Steel Suppliers at the Conectiv site.  (Exh. G, Kilpatrick Affidavit, ¶22; Exh. E, Dep. of David, pp. 37, 57, 63, 67, 73 & 97; and Exh. C, Dep. of Slater, pp. 239-240.)

23.  Slater never requested Kilpatrick, as Business Manager, to file a complaint or grievance under the terms and conditions of the CBA while he was employed at Steel Suppliers at the Conectiv site.  (Exh. G, Affidavit of Kilpatrick, ¶22.)

24.   The allegations contained in paragraph 23 of Plaintiff's Complaint are inaccurate since those alleged events occurred in December 2001 and January 2002.  (Exh. C, Dep. of Slater, pp. 207-211; and Exh. A, Dep. of Mann, pp. 138-140.)

25.   The facts alleged in paragraph 23 of Plaintiff's Complaint occurred at the Free Bridge over the Delaware River between Easton, Pennsylvania and Phillipsburg, New Jersey while Slater was employed by IEW and not while working for Steel Suppliers Erectors, Inc.  (Exh. C, Dep. of Slater, pp. 207-211; and Exh. A. Dep. of Mann, pp. 138-140.)

26.   Charles Mann (Mann) never told Slater that Frankenfield engaged in any activities which could be construed as racially offensive as alleged in paragraph 24 of Slater's Complaint.  (Exh. A, Dep. of Mann, pp. 143-145.)

27.   Slater filed a Charge with the Equal Employment Opportunity Commission (EEOC) alleging violations of Title VII on the basis of racial discrimination on November 26, 2003 (Exh. M).

28.   Neither David as steward or Kilpatrick as Business Manager filed a grievance on behalf of Slater while Slater was alleging racial discrimination in violation of the CBA while Slater was employed by Steel Suppliers at the Conectiv job site.  (Exh. C, Dep. of Slater, p. 240.)

29.   Every African-American who applied for membership in Local 36 for the period 2001 to 2003 was accepted for membership.  (Exh. G, Kilpatrick Affidavit, ¶21.)

30.   From July 17, 2003 to October 21, 2003 Slater appeared at Local 36 and signed the out-of-work referral sheet at the following dates and times:

| DATE | TIME |
|------|------|
| 7/17/03 | No time listed |
| 7/21/03 | No time listed |
| 8/11/03 | 12:30 p.m. |
| 8/15/03 | 9:45 a.m. |
| 8/25/03 | 9:30 a.m. |
| 9/16/03 | 12:00 p.m. |

| | |
|---|---|
| 9/19/03 | 9:30 a.m. |
| 9/23/03 | 7:00 a.m. |
| 10/2/03 | 12:00 p.m. |
| 10/3/03 | 7:30 a.m. |
| 10/7/03 | 6:50 a.m. |
| 10/21/03 | 10:00 a.m. |

(Exh. G, Affidavit of Kilpatrick, ¶23; and Exh. J, Iron Workers Local Union #36 Referral List dated 6/1/03 to 1/5/04.)

31.  Members who appear for work appear at the Local 36 Union hall and sign the referral sheet after 7:00 a.m. on a work day will not be assigned to work since the work day starts at 7:00 a.m.  (Exh. G, Affidavit of Kilpatrick, ¶23.)

32.  Slater was assigned to work in October 2003 at a work site in Bloomsbury, New Jersey.  (Exh. G, Kilpatrick Affidavit, ¶24.)  After that assignment, Slater never appeared at Local 36 again.  He never contacted Kilpatrick for work referrals after that date and he never signed the out-of-work referral list again.  (Exh. G, Kilpatrick Affidavit, ¶24; and Exh. C, Dep. of Slater, pp. 217-218.)

33.   Ruben Soto was a member of Iron Workers Local 399 and was never a member of Iron Workers Local 36.  (Exh. D, Dep. of Soto, pp. 10-11.)

Respectfully submitted,

MARKOWITZ & RICHMAN

Date:  11/9/06                By:  /S/ QUINTES D. TAGLIOLI, ESQ.
                              QUINTES D. TAGLIOLI, ESQUIRE
                              512 Hamilton St., Suite 200
                              Allentown, PA  18101-1505
                              610-820-9531
                              I.D. #30158

                              *Attorney for Defendant*
                              *Iron Workers Local 36*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | : | NO. 2:05CV03389-GP |
| OPPORTUNITY COMMISSION, | : | (CONSOLIDATED) |
| *et al.,* | : | |
| | : | |
| Plaintiffs | : | THE HON. THOMAS M. GOLDEN |
| vs. | : | |
| | : | |
| CONECTIV, *et al.,* | : | |
| | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Quintes D. Taglioli, Esq., attorney for Defendant Ironworkers Local 36, do hereby certify that I have electronically filed the within Defendant Ironworkers Local 36 Motion for Summary Judgment Pursuant to F.R.C.P. 56, Defendant Ironworkers Local 36's Brief in Support of its Motion for Summary Judgment, Order, and Statement of Undisputed Facts in Support of its Motion for Summary Judgment with notice to the parties electronically registered and by first class mail to the parties who are not electronically registered.

Joanne Rathgeber, Esquire
HILL WALLACK
111 East Court Street
Doylestown, PA 18901

Kimberly Kaplan, Esquire
REED SMITH, LLP
2500 Liberty Place
1650 Market Street
Philadelphia, PA 19103

Robert Cottington, Esquire
Joseph P. Milcoff, Esquire
REED SMITH, LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886

Paul Cottrell, Esquire

Terrence R. Cook, Esquire
EEOC – The Boarse Bldg.
21 South Fifth Street Suite 400
Philadelphia, PA 19106-2515

David Newmann, Esquire
HOGAN & HARTSON, LLP
1835 Market Street, 28th Floor
Philadelphia, PA 19103

Harry T. Jones, Esquire
Susanne Harris Carnell, Esquire
HOGAN & HARTSON, LLP
555 13th St., N.W., Columbia Square
Washington, D.C. 20004-1109

Wayne Stansfield, Esquire

One Customs House, Suite 500                     Sara Begley, Esquire
P.O. Box 1031                                    REED SMITH, LLP
Wilmington, DE 19801                             2500 One Liberty Plaza
                                                 1650 Market Street
                                                 Philadelphia, PA 19103-7301


Hannah Schwarzschild, Esquire
WILLIG WILLIAMS & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103




                                      Respectfully Submitted,

                                      **MARKOWITZ & RICHMAN**


Date: 11/09/06             By:    */s/ Quintes D. Taglioli, Esquire*
                                  QUINTES D. TAGLIOLI, ESQUIRE
                                  I.D. # 30158
                                  512 Hamilton St., Suite 200
                                  Allentown, PA 18101-1505
                                  (610) 820-9531
                                  Attorney for Defendant Ironworkers
                                  Local 36